Dole *v.* Irish.

ERIE GENERAL TERM, February, 1848.  *Mullett, Hoyt, Sill, and Marvin,* Justices.

DOLE, adm'r of Jameson, *vs.* IRISH.

The private property of the Seneca Indians is not within the jurisdiction of our laws respecting administration. And letters of administration, granted by a surrogate, upon the estate of a deceased indian, are void.

The distribution of the property of a deceased indian, among his relatives, according to the customs of the nation, passes a good title; which the courts of this state will not disturb.

THIS was an action of trover for a horse, tried at the Erie county circuit court, before the Hon. Justice Marvin, in November, 1847. The jury rendered a special verdict, finding, in substance, the following facts: That the plaintiff was appointed, by the surrogate of the county of Erie, administrator of all and singular the goods and chattels which were of Jesse Jameson, deceased; and as such administrator, in the month of March, 1846, and before the commencement of this suit, he demanded

the horse in question of the defendant, and at the same time produced and showed to the defendant the letters of administration, and that the defendant refused to deliver the horse. That Jesse Jameson, the intestate, at the time of his death, was an indian, belonging to the Seneca nation, and died upon the Seneca reservation, within the county of Erie, in the month of May, 1844. That at the time of his death he owned, among other things, the horse in question. That it is a custom among the Seneca indians, which has existed from time immemorial, when one of the said nation dies, for the relatives of the deceased to meet at his last place of residence, ten days after his death, and divide his property among his relatives. That, pursuant to such custom, and ten days after the decease of the said Jesse Jameson, and before the said letters of administration were granted to the plaintiff, the relatives of Jameson met at his last place of residence, on the said reservation, made a division and distribution of his property, and appropriated the horse in question to his relative John Jameson; and that John Jameson afterwards, and before the granting of the letters of administration to the plaintiff, sold the horse to the defendant.

For the plaintiff it was claimed that the goods of every person dying within this state are subject to administration according to the laws of this state, even though the deceased may be a subject of a foreign state, and the goods be distributed according to the laws of such state. And even if it were not so, that the indians living within this state are subject to the laws of this state. 2 *Kent's Com.* 67, 6th ed.; *Story's Confl. of Laws,* 422, §§ 512, 513; *Dayton's Surrogate,* 1, 2, 245, 246; 20 *John. Rep.* 192; 1 *R. S.* 73, 2d ed.; *Sess. Laws* 1843, *p.* 63; were referred to as sustaining or illustrating some or all of the above propositions.

On the part of the defendant, it was answered that the Seneca indians, although located within this state, were permitted to exercise many acts of sovereignty respecting their own internal police and the title to their property, and in these respects were not subject to the laws of this state. That the property of Jesse Jameson having been distributed according to the im-

memorial custom of the indians, the surrogate had no jurisdiction over the subject, and could give the plaintiff none.   That the defendant, having derived his title to the horse in question under such indian custom, could not be divested of his property by the plaintiff, under pretence of any power derived from the surrogate; and the opinion of Chief Justice Marshall in the case of *Worcester* v. *Georgia*, (6 *Pet. Rep.* 534 *to* 562;) the case of the *Cherokee Nation* v. *Georgia*, (5 *Id.* 1;) 3 *Kent's Com.* 385, *n.* (*a.*); and 20 *John. Rep.* 710, were referred to.

*M. Fillmore*, for the plaintiff.

*E. Cook*, for the defendant.

*By the Court*, MULLETT, J.   Whatever may have been the relations between the Europeans and the native indians, growing out of the discovery of this country by the former, and the uncivilized condition of the latter, the relations between the English of New-York and the Six Nations have been established by convention for more than one hundred and twenty years. Judge Smith, the able historian of the colony of New-York, informs us that in the year 1726, at a meeting of the chiefs of the Six Nations at Albany, Governor Burnett procured from them a deed surrendering their country to his majesty the king of Great Britain, to be protected for their use; and that this was but a confirmation of a verbal grant made in 1721, and which was entered in the book of the secretary of indian affairs. The account of the transaction shows that this protection was solicited by the indians.   The chief who addressed Governor Burnett said: " We speak now in the name of all the Six Nations, and come to you howling.   This is the reason why we howl, that the governor of Canada encroaches on our land, builds thereon."   Although the relations thus established may not be different from those claimed by the Europeans without treaty, yet this deed settles the question between the state of New-York and these indians.   Both parties derive rights and duties from the relation thus acknowledged.   The indians are

Dole *v.* Irish.

no longer to be regarded as mere allies. They have a right to our protection, and we owe it to them as a duty. From these rights and duties, from the dependence of the indians on us, and their location within our territory, spring our rights of sovereignty and legislation over them, and their duty of fidelity, submission and obedience to us. Still, our intercourse with them has been in their national capacity. We have regarded them as nations having some sovereign power, and have permitted them to exercise that power over their own internal affairs. We have not attempted to extend our laws to their domestic relations, or to regulate the manner of their acquiring, holding or conveying property among themselves. We have never applied our doctrines of descent or distribution to their property, nor subjected them to our laws relating to wills, intestacy or administration ; nor are they applicable to their state of society. So far from interfering with their pecuniary affairs, or subjecting their persons or property to the civil jurisdiction of our courts, we have declared that no action shall be maintained against one of these indians, on his contract. (*Act of April* 10, 1813.)

If our laws have no jurisdiction over their property, our surrogates have no power to grant letters of administration upon it. Considering the weak and fast diminishing power of the indians, it may become our duty to extend our legislation over them and their property. The 4th section of the act of 1843, to enable non-resident aliens to hold and convey real estate, is one bold step towards taking the indians under the protection of our laws. Farther exercise of jurisdiction may still be necessary, until all vestiges of indian power and indian rights shall be brought under the broad shield of our civil jurisprudence—but when, and how, it shall become necessary or proper to seize on this dilapidated indian sovereignty, are questions to be decided by the legislature; and it does not become the judiciary, voluntarily, to march forward in such enterprises. I am of the opinion that the private property of the Seneca indians is not within the jurisdiction of our laws respecting administration; and that the letters of administration granted by the surrogate to the plain-

tiff are void.  I am also of the opinion that the distribution of indian property according to their customs passes a good title, which our courts will not disturb; and therefore that the defendant has a good title to the horse in question, and must have judgment on the special verdict.

Judgment for the defendant.

