Johnson v. Johnson's Adm'r.

—◦●◦◦—

JOHNSON, Respondent, v. JOHNSON'S ADMINISTRATOR, et al., Appellants.

1. Among the savage tribes of North American Indians marriage is merely a natural contract, and neither law, custom nor religion has affixed any conditions, limitations or forms other than those which nature herself has prescribed.

2. Permanency is not to be regarded as an essential element of marriage by the law of nature; otherwise all such connections as have taken place among the various tribes of the North American Indians—either between persons of pure Indian blood, or between half breeds, or between the white and Indian races—must be regarded as illicit and the offspring illegitimate; for it is well established that in most of the tribes, perhaps in all, the understanding of the parties is that the husband may dissolve the contract at his pleasure. The power of divorce in one or both of the parties to a contract of marriage, at his or her pleasure, is not inconsistent with the law of nature.

3. A mere casual commerce between the sexes does not constitute a marriage by the law of nature; but where there is a cohabitation by consent, for an indefinite period of time, for the procreation and bringing up of children, that, in the state of nature, would be a marriage.

4. It is well settled, as a general proposition, that a marriage, valid according to the law or custom of the place where it is contracted, is valid everywhere.

5. Where the legitimacy of children is called in question, especially after their death, and after a great lapse of time, every reasonable presumption should be indulged in in favor of legitimacy; very slight circumstances are sufficient to authorize a court or jury to find the existence of a marriage.

6. By the statute law of this state "the issue of all marriages deemed null in law, or dissolved by divorce, shall be legitimate;" (R. C. 1845, 1855, tit. Descents and Distributions;) hence, upon an issue of legitimacy, the inquiry is limited to the mere fact of a marriage *de facto*, and in this investigation the jury are bound to make every intendment in favor of the legitimacy of the children not necessarily excluded by the proof.

7. Where a white man, living in the Indian country, introduced an Indian woman into his family, cohabited with her and became the father of children by her, assumed and discharged parental duties toward those children, provided liberally for their education, introduced them into his household upon his subsequent marriage with another woman, secured their recognition in the social circle in which he moved, and their marriage as his daughters, made liberal provision for them in his will, and solemnly recognized them as his children in that instrument—no question being made as to their legitimacy during the life of the father—*held*, that all these circumstances constituted presumptive evidence of a marriage with the Indian woman, when its existence was questioned nearly fifty years after it is alleged to have taken place, when two of the children were dead leaving heirs, and the father also died without leaving any other children. *Held*, further, that the fact, that after cohabiting with the Indian for years, the white man separated from her and sent her back to her tribe, could have no tendency to overthrow the presumption of a marriage arising from the previous cohabitation and other circumstances, if such separation and sending away were consistent with the usages among the Indians, not only in reference to their own marriages, but to intermarriages with the traders who sojourned with them. It is a right conceded to the husband by the terms of the contract, and its exercise can not therefore be regarded as inconsistent with it.

*Appeal from St. Louis Land Court.*

This case has heretofore been before the supreme court and is reported in 23 Mo. 561. This was a suit instituted by Lucy Johnson, widow of Col. John W. Johnson, deceased, to obtain an assignment of dower in the real estate belong-

ing to said Johnson at the time of his decease. She claims one-half thereof as a dower under the third section of the dower act of 1845. The petition in the cause is set forth at large in the report of the cause in 23 Mo. 561. The petition sets forth in substance the following facts : Plaintiff was married to said Johnson in 1831 in the city of St. Louis, and lived with him as his wife in said city until his death, June 1, 1854. A marriage contract was entered into between the parties previous to their marriage. This contract is set forth in the report above referred to. By it, it was agreed that the separate property of the contracting parties should, during their joint lives, form a fund from the income of which they and their issue, if any, shuld be supported and maintained ; that " for the purpose of producing such income the said Johnson shall have the management of the said separate property of the said Lucy Gooding." It was also agreed that either might, in any manner or form, dispose of one-third of his or her said separate property without the other's interposing any obstacle ; also that either might at his or her death, by will, or declaration in the nature of a will, devise or bequeath to any person in absolute property whatever of his or her property might then remain, so that the survivor should be entirely divested of all interest therein ; that on the death of either party, the survivor should retain the full right and title in his or her separate property, and the property of the deceased party should be distributed according to the laws then in force. Said Johnson left a will, which was duly proved and admitted to record. After reciting the antenuptial contract above set forth, the will proceeds as follows : " And I, the said John W. Johnson, declare that after my marriage with my wife, the said Lucy Gooding, with her own free consent, I used and invested thirty-five hundred dollars of her money in erecting as a residence for ourselves during our lives, and at her request—stating the house we lived in on Elm street was too lonesome, and in consequence I erected the two-story brick building we now occupy, on my own

land, situated on the north side of Market street, in said city
of St. Louis, and No. 155, and cost me four thousand six
hundred dollars, as per my account book.  I devise and be-
queath to said wife Lucy, during her natural life, and no
longer, the said buildings, together with so much of my land,
&c., provided, however, my wife keep this house insured for
its full value ; if she does not, and the house is destroyed by
fire or otherwise, after my death, the loss must be hers and
not mine ; also the taxes to be paid thereon by her after my
death."  "The devises and bequeaths hereby made to my
wife Lucy are intended and declared to be in full satisfaction
of all and every claim, right of dower or other demands
which she may have to my estate, and on the express condi-
tion that it shall be received as such.  The real estate herein
mentioned and devised to my wife Lucy during her natural
life, I devise, after the said Lucy's death, to my grandson,
John E. Gleim, and his heirs and assigns ; and in default,"
&c.  The testator then proceeds to give directions as to the
manner of paying the bequest to the widow.  The testator
devised and bequeathed almost his entire estate to his daugh-
ter Eliza O. Perkins and his grandchildren Rosella Murdock
and John Edgar Gleim.  Nathaniel J. Eaton became admin-
istrator with the will annexed.  The other devisees, defen-
dants in this suit except plaintiff, accepted the provisions of
the will.  There never was any issue of said marriage.  The
petition proceeds to specify various lots and tracts of ground
of which said Johnson was seized at his death; also that
after plaintiff's marriage with said Johnson he received vari-
ous sums of money belonging to the plaintiff, amounting in
all to $5,801 ; that at the time of said marriage Johnson's
property was for the most part wholly unimproved ; that he
employed the money received of the plaintiff to render it
valuable and productive ; that Johnson " did never keep or
perform the said marriage articles on his part, but violated
and broke the same in every part and parcel thereof, and did
conduct himself in fraud and bad faith toward her in that

behalf;" that Johnson did merely use and employ the said articles of agreement for the purpose of getting into his possession the property of the plaintiff, and did afterwards refuse, fail and neglect to comply with the said articles in every thing mentioned therein for the benefit of the plaintiff; that he invested her estate so as to improve and enhance the value of his own estate and render it productive of an income for his own benefit and in his own name; that he did not apply the income honestly and in good faith to the maintenance of himself and plaintiff during their joint lives, but merely to the support of himself and certain relatives, children and their husbands and others; that plaintiff received nothing but her clothing, which did not exceed fifty dollars per year in value, and her board and lodging, while she was laboring and toiling assiduously for said Johnson; that the residue of the income derived in common from her property and his he invested for his own benefit and in his own name; that he pretended untruly in his will that he had used only $3,500 of her money, and that she had requested him to employ the same in erecting the house on his property on Market street; that he attempted, in violation of the marriage articles, to force her to elect to take a dower not worth $3,500, not only in satisfaction thereof but also in satisfaction of all other claim on his estate; that he wrongfully mixed up her property with his own; that she is now sixty years of age. She insists that as said Johnson did by his will devise to her an estate to be in full satisfaction of dower, he and all persons claiming under the will are estopped to deny her right to dower. On the 8th of December, 1854, she duly elected to take dower in said Johnson's estate under the third section of the dower act of 1845. On the 7th of December, 1854, she duly renounced the provisions of the will above referred to. Plaintiff insists that as Johnson did not in good faith comply with said articles of marriage on his part, she is not bound to comply with the same, and that she is released from all obligations or duty to keep or perform said articles, and

she claims to be entitled to dower in his estate notwithstanding the said articles.    Plaintiff prays that for her dower one-half of the real estate belonging to said Johnson at his death may be set off to her  absolutely, and also  for damages.

The defendants are N. J. Eaton, administrator with the will annexed of said Johnson, John Edgar Gleim, grandson, and Rosella Murdock, granddaughter of said Johnson, Eliza O. Perkins, daughter  of said Johnson, and Mason Johnson, trustee of said John Edgar, Rosella and Eliza O.    The infant defendants answered in the common form, submitting their rights to the protection of the court.    The adult defendants answered setting up the antenuptial contract and denying any breach thereof, denying that said Johnson invested any of the money or property of the plaintiff to improve or enhance the value of his own property or estate except as stated in his will.    Defendants allege that said Johnson faithfully performed and complied with the terms and stipulations of said antenuptial contract; that by a previous marriage said Johnson had three daughters born in lawful wedlock, and named Eliza O. Perkins, Mary Murdock, and Rosella Gleim; that Mary Murdock died during the lifetime of said Johnson, leaving a daughter, Rosella Murdock; that Rosella Gleim also died during the lifetime of said Johnson, leaving a son, John Edgar Gleim.    The defendants professed a readiness and willingness to refund to plaintiff the money Johnson states in his will he received from her and used in the construction of a dwelling-house for the accommodation of plaintiff and himself, to-wit, the sum of $3,500; also a readiness and willingness to pay interest on said sum from the date of the death of said Johnson to the time of answering, making the sum total of $3,885.    This sum they offer to pay on account of and in performance of the conditions of said ante-nuptial agreement.    Defendants also ask, if any other moneys should be found to have belonged to plaintiff before her marriage and to have come into the hands of said Johnson, that an account may be taken of such money or prop-

erty, and that the estate of said Johnson be charged therewith, and that upon payment thereof plaintiff might be forever barred of dower. This portion of the answer tendering money in compensation of the money and property appropriated by Johnson was stricken out on motion of plaintiff.

The court, on the calling of the case for trial, directed the following issue to be tried by a jury : " Whether John W. Johnson died without descendants in being capable of inheriting his estate." The substance of the testimony bearing on this issue is sufficiently set forth in the opinion of the court. The court, at the instance of the plaintiff, gave the jury the following instruction : " Unless the jury find that John W. Johnson, and the Indian woman with whom he cohabited, mutually agreed to live their whole lives together in a state of union as husband and wife, it was not a marriage, nor are the children born of such union capable of inheriting from the father."

The court refused the following instructions asked by the defendants : " 1. If the jury find that the late John W. Johnson took an Indian wife in the Indian country, according to the usages prevailing in that country, and cohabited with said woman, and had by her three children, as stated in the answer, who, or their descendants, are still living, then the jury ought to find the issue for the defendants. 2. If the jury find that the late J. W. Johnson cohabited with an Indian woman in the Indian country, and had by her three children ; that he raised and educated them as his own ; claimed and procured an allowance for them from the government as half breeds, and always held them out to the world as his children, such conduct of said Johnson is evidence of a marriage in fact between him and said Indian woman. 3. If the jury find that said J. W. Johnson was married to an Indian woman in the Indian country, according to Indian usage, and by her had issue still living, such issue are legitimate, although such marriage was, by the laws of this state, merely void. 4. If said Johnson and an

Indian woman, between the years 1812 and 1822, in the Indian country at and about Prairie du Chien, cohabited together for several years according to the usages prevailing at the place of such cohabitation, and did procreate children, such children are legitimate, and if any of them still survive, the jury ought to find the issue for defendants. 5. If said Johnson and an Indian woman cohabited together and had children, as stated in the foregoing instruction, such children are legitimate, although the parents, at the time of the cohabitation, agreed that their connexion should be dissolved at the pleasure of either party."

The jury found a verdict for plaintiff. At the final hearing of the cause much testimony was introduced bearing upon the question of the execution of the antenuptial contract by said Johnson, and its fulfilment by him, and the appropriation of plaintiff's moneys to his own use and benefit. The court found the facts substantially as set forth in the petition, and decided that plaintiff was not barred of her dower, and ordered and adjudged that she have and recover as dower one-half of the real estate mentioned in the petition, and appointed commissioners to allot, set apart and admeasure to her the said dower, and ordered further that plaintiff do have and recover of defendants her damages for being deforced of her dower. The court assessed the damages at $7,420.11, computing and estimating the same from the time of the death of said John W. Johnson to the time of trial. The defendants moved the court to set aside this assessment on the ground that it was excessive, and that the court erred in refusing certain instructions asked by defendants, and in assessing or computing plaintiff's damages from the date of the death of the testator to the time of trial. The court overruled the motion.

*Field, Jones & Sherman*, and *Krum & Harding*, for appellants.

I. The court erred in striking out the part of the answer in which defendants offered to pay whatever might be found

to be due to the plaintiff for moneys belonging to her and received by the testator. The court proceeded on the ground that this part of the pleading was bad, inasmuch as the formal requisites of a tender at law were not complied with. The plaintiff's case was purely equitable. The pleadings are to be judged by the rules of equity, and the answer of defendants in the particular part stricken out was conformable to the established precedents.

II. The law of marriage and legitimacy laid down by the court below in its instruction to the jury, is not the law of the land. The validity of a marriage must be tried by the laws or customs of the place where it is had. If it be valid there it is valid everywhere. (Story, Conf. Ll., § 113 ; Sutton v. Warren, 10 Met. 451, and cases cited.) The marriage of Col. Johnson and Tapissee was unquestionably good according to the laws and customs of the Indians. For the general customs as to marriage among the Indians, the court is referred to Robertson's America, book 4 ; 2d An. Hist. Col. of Wisconsin, p. 226, 176, 120 and 104 ; for Choctaw usages, see Wall v. Williams, 11 Ala. 826 ; for Cherokee usages, Morgan v. McGhee, 5 Humph. 13.) In the two cases just cited, the courts held that a marriage after the Indian custom and dissoluble at the pleasure of either party, was valid by the laws of Alabama and Tennessee. (See 8 Ala. 48.) But the instruction of the judge below does not correctly declare the local law of the state. For, if the parties to a contract of marriage were to insert a term or stipulation that the marriage should be dissolved at pleasure, such term or stipulation would be void, yet the marriage itself would be good. (Rutherforth's Instit. p. 173.) Furthermore, it has been the standing law of this state for more than thirty years that the issue of all marriages deemed null in law shall be legitimate. (See R. C. 1825, 1835, 1845, 1855, tit. Descents.) The instructions moved by the defendants on the trial of the issue, truly declared the rule of presumption arising out of the cohabitation of the parties and the actions

of Johnson in respect to the children. (2 Greenl. Ev. § 462.) Continued cohabitation and procreation of children is sufficient evidence of marriage. (Felts v. Foster, 1 Taylor, 72; Cheseldine v. Brewer, 1 Harris & McH. 152; 1 Dev. 337; 1 Penn. 450; 4 B. Monr. 575; 2 Nott & McC. 114; 9 Paige, 343; 1 Bland, 479; 2 Hay, 102; 4 Ala. 142; 1 Pick. 505; 3 Mo. 441.) And after a lapse of thirty years and when the parties are dead, legitimacy will be presumed on very slight proof. (Johnson v. Johnson, 1 Dessaus. 595.) After the strong proof of a marriage in fact between Col. Johnson and the Indian girl, deducible from his actions and conduct, his declarations made during his courtship of the widow Gooding, to the effect that he was a bachelor, &c., were undeserving of consideration. Yet in looking over the record it is plain that no evidence to disprove the marriage is to be found except these declarations. In Gaines v. Relf, 12 How. 534, the supreme court of the United States held this language: "The great basis of human society throughout the civilized world is founded in marriage and legitimate offspring; and to hold that either of the parties could, by a mere declaration, establish the fact that a marriage was void, would be an alarming doctrine."

III. The court below erred in finding that Johnson violated the marriage contract. The testimony warrants no such conclusion. The great effort on the part of the plaintiff was to prove the parsimony of Johnson, and that she was not indulged in the elegancies of dress. But the witnesses concur in saying that Johnson always kept up a decent domestic establishment, and the plaintiff, while living with him, was comfortable, contented and happy.

IV. But supposing that the marriage contract had been departed from by Johnson, a court of equity would do no more than give a fair compensation to the plaintiff. Surely there is no equity in enforcing so severe a penalty as is exacted in the present case.

V. There was error in awarding the plaintiff damages. She was entitled to none. The court below thought it was

assigning dower. But dower had been expressly waived by the plaintiff. Her right, on her own showing, was *as an heir* under the law and not as dowress. She claimed one-half of the estate on the footing of an ordinary heir. The estate had been all the while in the custody of the legal administrator, who managed it for the benefit of all concerned. As against the proprietors of the other half of the estate, she was no more entitled to claim damages than she was liable to pay them.

*S. T. & A. D. Glover* and *Richardson*, for respondent.

I. This court decided when this cause was here before that by plaintiff's petition she was legally entitled to dower in the lands mentioned ; that the marriage contract did not constitute a legal bar to dower within the provisions of the statute law of this state ; that it vested in plaintiff no estate ; that there nevertheless was such a thing as an equitable jointure ; that something more than a mere agreement is necessary to complete it ; that, in short, defendants had no legal defence ; that they might have an equitable defence ; that if they could show that the marriage contract had been performed, then they would have a right to demand of plaintiff the release of her dower, that is, they would then be entitled to a specific performance of the marriage contract against the plaintiff. It was also suggested that such a defence must be made with a tender of what moneys had been received by the husband from the wife. The defendants made out no case for specific performance. The plaintiff's right is unquestioned, and defendants are called upon to show some affirmative matter whereon to compel her to give it up. They simply ignore the allegations of the petition. They admit that $3,500 were received as stated in the will; this they are ready and willing to pay ; they have the money, but do not pay and will not pay. The answers made no showing of any equitable title in defendants to plaintiff's dower. The defendants rest their case on negative and not affirmative matter; persisted in treating the case as one in which plaintiff must show her

right to dower, not as one in which the defence was bound to show that Johnson in his lifetime, and they since, had done what they ought in relation to the marriage contract. They admit that Mrs. Johnson had and still has due to her large sums of money on the contract which they could pay and will not pay to her. The evidence shows that Johnson trifled with his agreement with his wife touching her dower, and conducted himself in gross bad faith. He appropriated $5,801 of her money, used it in improving his land, made no account of it, and denied it, put the denial in his will, admitted only $3,500 out of the amount, without interest at the end of twenty-four years, and attempts to force that on her in lieu of dower and other claims, not even that, but an annuity of about four hundred dollars per annum for a life after sixty years.

II. The instruction given to the jury with respect to the marriage of Johnson to the Indian woman was correct. (Bishop on Marriage & Divorce, 32 ; Shelf. on Mar. & Div. 1.) The defendants' instructions were properly refused. They were erroneous. There was no evidence tending to show that the Indian woman was a wife. The facts in evidence if accompanied by a separation of a marriage, would be evidence of a marriage. (2 Stark. Ev. 510 ; 2 Greenl. Ev. § 462.)

III. The offer to pay with no money in court was no tender.

IV. The instructions asked on the assessment of damages by the defendants were all improper.

NAPTON, Judge, delivered the opinion of the court.

This case was here before on a demurrer to the petition, and the decision of the court will be found reported in 23 Mo. 561.

When the case returned to the land court, an answer was filed by the adult defendants, setting up the antenuptial settlement as an equitable bar to the claim for dower, and denying the several charges, made in the petition, of breaches of the contract and general bad faith on the part of Johnson,

and offering to pay the amount of money received by Johnson from his wife upon their marriage, as specified in his will, and whatever additional money might appear upon investigation to have belonged to the plaintiff originally, and to have been received by the testator.

This part of the answer, which tendered compensation of breaches of the antenuptial contract in the event that such breaches should be found by the court, was stricken out, and the court directed an issue to be tried by a jury: " whether John W. Johnson died without descendants in being capable of inheriting his estate." This issue was found, under instructions from the court, for the plaintiff, and the court, proceeding to a final hearing of the cause, found all the facts in conformity to the allegations of the petition, and gave judgment for the plaintiff, in accordance with her claim under the third section of the act of 1845 concerning dower, for one-half in fee of all the deceased husband's real estate subject to his debts. After commissioners had been appointed to admeasure dower under this judgment, and had reported, a final judgment was entered to the same effect, and damages were assessed at $7,420.11.

The question of most importance, which presents itself in the outset of this case, is the one which arises upon the instruction given to the jury upon the trial of the issue of legitimacy. That instruction is, " unless the jury find that John W. Johnson, and the Indian woman with whom he cohabited, mutually agreed to live their whole lives together in a state of union as husband and wife, it was not a marriage, nor are the children of such union capable of inheriting from the father."

Col. Johnson, it appears from the testimony taken at the trial, was a government factor at Prairie du Chien in 1812, at that time a military post in the Indian country, and outside of the limits of any state. Whilst there, he formed a connexion with an Indian woman, the daughter of a chief named Keokuk, with whom he lived for several years, and by whom he had three children, daughters, named Rosella,

Johnson v. Johnson's Adm'r.

Mary and Eliza. These children were brought up and educated by Col. Johnson in conformity to his circumstances and condition in life; were introduced into society, after their education was finished, as his daughters; remained inmates of his household after his removal to St. Louis in 1822, up to the period of their marriage, and were in all respects treated by him as a father would be expected to conduct himself towards his legitimate children, and were finally provided for in a will, which left to them or their descendants the bulk of his fortune, which amounted to about one hundred thousand dollars.

Shortly after his removal to St. Louis, Col. Johnson married the plaintiff, having left the mother of these children with her tribe, and it not appearing from the testimony whether she was living or not at the time of the marriage with the plaintiff. Some testimony was given at the trial explanatory of the custom of the Indians in relation to their marriages. It seems that there were connexions formed between the traders and the Indian women, which were regarded as marriages, and others which the witnesses did not so consider. What were the characteristics which distinguished the one from the other did not very clearly appear; but there was no evidence that in either case the husband was not regarded as at liberty to leave his wife at his pleasure. Some of the witnesses testified in relation to the ceremonics which sometimes accompanied a marriage. There was no evidence in relation to the origin of the connexion between Col. Johnson and Tapissee (the woman with whom he lived), nor did it appear what the nature of the contract was between them, except as it was to be inferred from the facts stated above.

There is doubt that *permanency* enters into the idea of marriage as understood among all civilized and christian people, and the proposition stated in the instruction of the land court is undoubtedly well sustained by writers who have discussed the subject of marriage. It may be further conceded that, even by the law of nature, a mere casual commerce between the sexes does not constitute a marriage. But when

there is a cohabitation, by consent, for an indefinite period of time, for the procreation and bringing up of children, that, in a state of nature, would be a marriage; and, in the absence of all civil and religious institutions, may safely be presumed to be, as it is termed by some writers, " a marriage in the sight of God." (Sclford on Marriage & Div. p. ——.) " It has been made a question," says this author, " how long the cohabitation must continue by the law of nature, whether to the end of life. Without pursuing that discussion, it is enough to say that it can not be a mere casual and temporary commerce, but must be a contract at least extending to such purposes of a more permanent nature in the intentions of the parties." (Id. p. 9.)

If permanency is to be regarded as an essential element of marriage by the law of nature, it is clear that all such connexions, which have taken place among the various tribes of North American Indians, either between persons of pure Indian blood, or between half breeds, or between the white and Indian races, must be regarded as a mere illicit intercourse, and the offspring be considered as illegitimàte; for it appears to be well established by historians and travellers, as well as by the reported testimony in judicial proceedings occurring in the courts of some of our states, that in most of the tribes, perhaps in all, the understanding of the parties is that the husband may dissolve the contract at his pleasure. In a work published by Mr. Schoolcraft concerning the manners and customs of the North American Indians, under the authority of the government of the United States, the writer says: " The marital rite is nothing more, among our tribes, than the personal consent of the parties, without requiring any concurrent act of a priesthood, or magistracy, or witnesses; the act is assumed by the parties without the necessity of any other extraneous sanction except parental consent. Presents are, however, often made, if the parties are able. *It is also disannulled and the wife dismissed from the wigwam whenever the husband pleases,* or the marital state is continued under the evils of discord or a state of polygamy. The

latter is however the usual method among the hunter and prairie tribes. But the ties of consanguinity are still strictly acknowledged; children become possessed of all their natural rights, and family tradition traces these to their remotest links." In Robertson's History of America, (book 4,) the same peculiarity is noticed as characterizing the contract of marriage as it prevailed among the natives of South America.

In the case of Wall v. Williamson, 11 Ala. 839, it appeared in evidence that, by the Choctaw law, the husband could dissolve the relationship at pleasure, and a marriage of this kind, within the limits assigned to that tribe, was held valid. The court says that "marriages among the Indian tribes must be regarded as taking place in a state of nature; and if, according to the usages and customs of the particular tribe, the parties are authorized to dissolve it at pleasure, the right of dissolution will be considered a term of the contract. Either party may take advantage of this term, unless it be expressly or impliedly waived by them; or they may perhaps acquire such relations to society as will give permanency to the contract and take from them the right to avoid it." The same doctrine had been held by the court in the same case, reported in 8 Ala. p. 48.

In Tennessee, a marriage among the Cherokees, according to the usages of that tribe, within the limits of that state, was held valid. And it appeared that all that was necessary to constitute a marriage by these usages was a public agreement to live together as man and wife, and the fact that two persons did so live together was considered evidence of such agreement. In this case (Morgan v. McGhee, 5 Humph. 14,) the husband was a white man, and there were children of the marriage, and the supreme court, in passing on the case, observe: " To hold this marriage to be void would be to vitiate all the marriages made in the nation, (Cherokee,) and might be productive of much mischief." Proceeding, therefore, on the principle that the courts in Tennessee would recognize as valid all marriages of a foreign country made in pursuance of the forms and usages of that country,

they applied the doctrine to a marriage between a white man and an Indian, made within the Indian nation, conformably to the customs of the tribe.

Judge Story, in his work on the Conflict of Laws, considers marriage, as in its origin, a contract of natural law; that "it is the parent and not the child of society;" that in all civilized countries' it becomes a civil contract regulated by law, and in many has superadded to it a religious obligation. So that the contract is a natural, civil or religious one, or embraces all these elements, according to the condition of society in which it occurs. It is plain that, among the savage tribes on this continent, marriage is merely a natural contract, and that neither law, custom or religion has affixed to it any conditions or limitations or forms other than what nature has itself prescribed. It can hardly be said that the power of divorce, in one or both of the parties to the contract, at his or her pleasure, is inconsistent with the law of nature. The fact, as we have seen, is otherwise. To what quarter shall we look for proofs of the law of nature, if we exclude the manners and customs of the American aborigines?

It is well settled, as a general proposition, that a marriage, valid according to the law or custom of the place where it is contracted, is valid everywhere. (Story's Conf. of Laws, § 113; 2 Greenl. Ev. § 460.) It is equally clear, both upon authority and upon general principles of public policy and natural equity, that where the legitimacy of children is called in question, especially after their death and after a great lapse of time, every reasonable presumption is indulged in favor of legitimacy. Very slight circumstances have been held sufficient to authorize a court or jury to find the existence of a marriage. In the case of Johnson v. Johnson, 1 Dessaus. 595, the testator had used an expression in his will which had a tendency to create a doubt as to his son's legitimacy; and the only proof to remove the suspicion was the simple fact that the father and mother had lived together as husband and wife, and were so considered in the neighbor-

hood. Thirty years had elapsed, and all the parties were dead, and the illegitimacy of the son would let in the collateral relations of the deceased. The court of Chancery declared that " to bastardize a person after his death was contrary to every principle of law, justice and equity," and decreed accordingly in favor of the legitimacy of the son.

Where there has been a marriage *de facto*, and the parties to it are dead, although no direct proceeding can ever be had to invalidate it, yet if children have sprung from the union, the question of their legitimacy may incidentally and necessarily involve the validity of the marriage. Our statute has however, even in such cases, precluded the necessity of any inquiries of this sort, by declaring the issue of all marriages deemed null in law to be legitimate. Under our law, upon an issue of legitimacy, the inquiry is limited to the mere fact of actual marriage; and upon this investigation, confining ourselves to the rules of evidence established before this significant change in the law, the jury are bound to make every intendment in favor of the legitimacy of the children not necessarily excluded by the proof. (Senser et al. v. Bower and wife, 1 Penrose & W. 452.) In the case of Cheseldine, lessee, v. Brewer, 1 Harr. & McH. 152, upon a question of legitimacy, the jury were instructed that if they found the reputed parents of the person claiming as heir had consented and agreed to be man and wife and had cohabited as such before the birth of the claimant, they should render their verdict for the plaintiff, and this direction of the court was sustained upon appeal. The supposed marriage had occurred in the state of Maryland, and of course, if it had in fact taken place, had been accompanied with the ceremonies and attended with the sanctions, civil and religious, which the laws of that state required.

The separation of Col. Johnson from the mother of his children can not, under the facts of this case, be regarded as tending to rebut the proof of a marriage. Such a separation, in ordinary cases, óccurring between persons of the same race and in a civilized country, is undoubtedly compe-

tent evidence to rebut the presumption arising from previous cohabitation. (Senser v. Bower et al., 1 P. & W. 452.) But the fact here, if established to be consistent with the usages among the Indians, not only in reference to their own marriages, but to intermarriages with the traders who sojourned with them, could have no tendency to overthrow the presumption arising from the previous cohabitation. It seems to be a right conceded to the husband by the terms of the contract, and its exercise can not therefore be regarded as inconsistent with it.

The declarations of Col. Johnson, reported by some of the witnesses, as made upon the eve of and perhaps subsequently to his marriage with the plaintiff, that he was a bachelor, are not entitled to any consideration. Such expressions are readily accounted for without being understood as indicating an intention to bastardize his children—an intention contradicted by all the acts of his life in reference to these children. His assumption and performance of parental duties, his care in providing for their education, his introduction of them into his household after his marriage with the plaintiff, their recognition in the social circle in which he moved, their marriage as his daughters, the liberal provisions for them in his will, and his solemn recognition of them in that instrument; all these circumstances, without any question, so far as the testimony shows, being ever made of their legitimacy during the life of the father, certainly constitute presumptive evidence of a marriage, when its existence is questioned nearly fifty years after it is alleged to have taken place, and when two of the children are dead leaving heirs, and the father is dead without any other children, and his widow is also dead without children, either by her first or second husband.

We have not been able to perceive any good reason for striking out a portion of the defendant's answer; but as the entire evidence in support of the defence is now before this court, the question becomes immaterial. We are satisfied, from the testimony, that the conduct of Col. Johnson has not

been such, in reference to the antenuptial agreement with the plaintiff, as to justify a specific performance of that agreement with a view to her exclusion from her legal right to dower. We do not allude to any charges of supposed illiberality to his wife during their marriage union, for there is no good ground for concluding that there was any serious disagreement or ill-feeling between them; but the provisions of the will were certainly inadequate, and not a *bona fide* execution of the contract. And as the testator, whether by the consent of his wife or not, thought proper so to invest the money received from her on the marriage, as to be entirely inaccessible to her for any of the uses contemplated by the antenuptial agreement, and it would be extremely difficult, if not impracticable, to trace the fund so used in the improvement of the testator's real estate, and ascertain its present value, we concur in the conclusion of the land court that the right to dower was not barred.

It will be seen that, in our view of this case, the question of damages becomes immaterial. The death of the plaintiff having been suggested since the case came here, her representatives would be entitled to one-third of the rents and profits of the real estate of which her husband died seized, from the time of his death to the date of the assessment; together with such proportion of the slaves and personal property of the husband as they may be entitled to under the second section of the act of 1845 concerning dower. It is not intended by this opinion to debar the plaintiffs from taking under the antenuptial agreement, but, as the bill is not framed with that view, we consider it unnecessary to notice that branch of the subject.

The judgment is reversed and the case remanded. Judge Scott concurs.