JEREMY COMPO v. JACKSON IRON CO.

*Bill to establish title.*

The officers of an unincorporated mining association gave an Indian, who had aided in locating the mine, a certificate dated in 1846, which entitled him to an interest in the location. 'A corporation was organized from this company and chartered in 1848, and was succeeded in 1849 by another corporation which refused to recognize this claim when presented many years after the Indian's death, by a person to whom the Indian's daughter had assigned it. The Indian died about 1862, and the certificate was assigned in 1879. This daughter was the child of the second of three women who had lived with the Indian as his wives after the uncivilized manner of the tribe; and it appeared that when the claim was presented there was living a son of another daughter born to the Indian in his previous relation, though there was no showing that this son was born in wedlock. *Held* that a bill filed by the assignee to enforce the claim should be dismissed.

CooLEY, J. holding that the assignee had not made out an exclusive title by descent, and that the claim was barred by laches.

GRAVES, C. J. concurring in the result.

CAMPBELL, J. dissenting.

Appeal from Marquette. (Grant, J.) April 18.—June 13.

BILL to establish title. Defendant appeals. Reversed; bill dismissed.

*F. O. Clark* for complainant.

*M. H. Maynard, F. J. Wing* and *C. I. Walker* for defendant.

CAMPBELL, J. (Minority opinion.) The object of the bill in this case is to obtain an accounting and other proper relief against defendant, by reason of an agreement made by the association now represented by defendant and existing in 1846, promising and securing to an Indian Chief named in the record Marji Gesick, twelve thirty-one hundredths of the mining property in Marquette county, originally known as location 593, owned and worked by defendant. The bill is substantially the same as when before us on demurrer, as the case is reported in 49 Mich. 39. It will only be necessary, therefore, to refer to the facts in evidence and the views taken of them by the parties.

In 1846 a joint stock association was in existence, unincorporated, organized chiefly by persons who had resided in Jackson, Michigan, the purpose of which was to pursue mining enterprises on Lake Superior. The affairs were managed for ordinary purposes by five trustees, including a president and secretary. The interests were divided into 3100 shares, of which 500 were treated as paid in full and unassessable, and the rest assessable. The paid up shares were to be used for sale to raise funds. The remaining 2600 shares were in private hands. It was contemplated by these articles that all lands purchased or otherwise procured should be dealt with as company property, on the footing of personalty, and the interests of share-holders be treated as personal property on the basis of partnership or corporate interests.

In 1845, before the surveys were completed, and before any lands in that region were ready for sale or entry, the war department issued location warrants, commonly called *permits*, to individuals to authorize them to explore and locate tracts of one mile square, and on certain conditions to obtain leases of such locations which contemplated further extensions unless Congress should legislate and provide for

sales. Some members of the company went up to Lake Superior and prepared to explore. Marji Gesick being with his people at L'Anse, which is considerably further up the lake, and being regarded as well qualified to give useful information concerning mineral deposits, Mr. Everett, one of the company's agents, sent for him to assist them. Marji Gesick came over and showed them the iron mine in question, and the location was made by placing the centre near the principal outcrop, and surveying a square mile including it. This land was then included in a permit which had been issued to James Ganson, but was owned by the company. In due time a lease was granted on the usual terms by the War Department. In 1847 Congress passed an act whereby lessees who had performed their conditions were allowed a pre-emption at $2.50 an acre. It does not appear distinctly how soon these lands were surveyed into sections and open to formal entry, but the incorporated company obtained a pre-emption under the lease and finally became patentees. Some question was made on the argument whether this title could be regarded as obtained under the permit and lease. It appears, however, that such was the ground on which the Land Office proceeded, and it is not open to controversy collaterally. There can be no doubt on the facts that the company could not have secured the property at the price in any other way.

In the summer of 1846, the directors sent up two of their members, Mr. Berry the president, and Mr. Kirtland the secretary, to attend to matters on Lake Superior, and gave them a formal authority in the shape of a power of attorney, signed by two directors other than these officers. These gentlemen came to a settlement with Marji Gesick for his services and gave him a writing signed by them officially, whereby it was agreed he should have an interest of twelve thirty-one hundredths in the location, and this is the interest in dispute.

The question is now made whether this instrument created any valid interest. It is first objected that it was made without authority. It is not seriously disputed that such an

arrangement could have been made by the board of directors as such. But it is said that two directors out of five could not grant such a power. It does not appear to us that any such difficulty exists. The articles expressly authorize action by a majority of the directors. It must not be overlooked that this was nothing more than a partnership, managed by a body of selected persons called directors. When the articles provided for a president and secretary it must be assumed that these officers were expected to execute such papers as might be proper to bind the company, and might as directors concur with others in determining what their duty in various cases should be. The power which was given them must be regarded as emanating from all of the four directors who agreed upon it. They cannot be excluded in the proceeding. And inasmuch as the instrument is one not apparently beyond the proper functions of a general agent of the company, it would not be incumbent on Marji Gesick to go behind or question the authenticity of an agreement bearing the signature of the only persons who usually act for such bodies. We think it bound the company, and we think the officers did not exceed their powers actual or presumptive.

Inasmuch as the instrument in question operated to give the grantee an absolute right to the shares mentioned in the mining location, it was equivalent to twelve full paid and unassignable shares in the company, and was so regarded in a subsequent proceeding. It does not appear from the record whether certificates had been issued to the various share-owners. But their rights did not depend on the certificates, although these are the usual evidences of title.

In 1848 an act of incorporation was obtained from the State of Michigan, which appears plainly from the record to have been at the instance and for the benefit of this company, which deliberated as a body upon accepting the charter, and settled in advance upon the rights of members. In the preliminary action the rights of Marji Gesick and of some other Indians were expressly recognized and directed to be provided for, and were as before suggested

regarded as equivalent in character to unassessable shares. Some difficulty seems to have been found in the fact that the 500 shares before referred to had been sold. The committee directed to make the proper arrangements do not seem to have done anything. But this action not only recognized the right of Marji Gesick, but contemplated that it should pass into the new organization, as it must have done equitably, inasmuch as all of the partnership property became the property of the corporation. And it, for the same reason, passed into the present corporation, which is the successor of the old one, precisely as that succeeded its immediate predecessor, unless in some way wiped out of lawful existence. The proportionate. interest in the corporate fund must still exist in Marji Gesick's successors unless destroyed by lapse of time. No other reason is to be found for denying its existence. We have not overlooked the fact that the company has other property, but under all the circumstances it is evident .that the whole concern has sprung up chiefly if not entirely from the mine or its proceeds, out of which the original outlay has been refunded.

Marji Gesick died, as nearly as we can determine from the record, about 1861 or 1862. If his name had been entered on the stock ledger, or if certificates of stock had been issued to him, there can be no doubt his rights as a stockholder would continue unless actually forfeited by some proceeding taken by the company to declare the forfeiture. It is not clear to our minds that without some new arrangement he could have been subject to any assessments. But whether this should be so or not, it is certain he could not lose his stock by mere non-payment when no payment is shown to have been called for, and no forfeiture was asserted for alleged non-payment. A stockholder is not called on to do any act to keep up his position as such when nothing is done to assail it. The fact that this corporation went into existence under an expressed recognition of his rights on the records which came to them as their official muniments, put him in as good a position as he could have obtained by any other entry. We do not see how the cor-

poration under ordinary circumstances could be in a posi-
tion to claim a bar by lapse of time against him unless there
had been some controversy. Where there has been no
legal bar it is true that there may nevertheless be an
equitable bar arising from laches, if it has been injurious.
If not injurious the lapse of time will not necessarily inter-
fere; neither will it always do so when there has been no
culpability. It is therefore important to see just what this
long interval has brought about.

Between the organization of the corporation and the end
of the year 1860, assessments had been levied to something
more than ninety-five per cent. of the par of the stock, and
had been expended with the product of the mine in buying
other property and making improvements, and other out-
lays for the general benefit. In 1861 the company began
to pay dividends which have amounted to about 1790 per
cent. on the capital stock, besides accumulating a large sum
in addition. In 1877 the company, whose charter was
nearly out, reorganized on its present basis. The changes
by sales to new stockholders have not been considerable
during this period.

Marji Gesick never separated from his tribe in fact, and
was never separated from it by any legal implication. It
was held by the United States Supreme Court in the case
of the *Kansas Indians* 5 Wal. 737, and the *New York
Indians* 5 Wal. 761, that the tribal relation of Indians
could not be regarded as broken up so long as it was recog-
nized by the political department of the Government. A
similar principle had been laid down in *United States v.
Holliday* 3 Wal. 407, where the Indian (belonging to the
same tribe with Marji Gesick) held to these relations, had
exercised rights under the laws of this State, as having so
far as he could by his own act detached himself from his
tribe. In the case now before us the record indicates that
Marji Gesick lived in all respects as a tribal Indian. The
mine had become substantially a dividend paying mine at
the time of his death.

I can find nothing which would have justified any court

in holding that he had lost any right by laches. He appears to have remained in the country, not far from the mining district, and to have been well known to the persons in charge of the mining concern. There is no evidence tending to show that from the beginning, when his claim was well known and distinctly recognized, any attempt was made to settle with him or to demand assessments of him. It can hardly be supposed that a wild Indian, whose dealings with the Government were not affected by delays or lapse of time, would expect to be held to diligence in looking after rights that had not been disputed. ,

A more important question, and one on which there was considerable discussion, relates to the transmission of his rights after his decease.

It was not, and could not very well be insisted, that any probate intervention was necessary to settle his estate. The Indian tribes are not within the ordinary State jurisdiction, and it seems to be a necessary result that their interests pass directly to their heirs. Such is the doctrine laid down in *United States on the relation of Davis v. Shanks* 15 Minn. 369; and *Dole v. Irish* 2 Barb. 639. This has been the usage also of the Government under treaties.

Although changes have been made by more recent legislation, the cases before referred to indicate that at the time of Marji Gesick's death and for some years thereafter such rights of inheritance as belonged to his heirs could not have been determined without reference to the existing tribal relations of himself and his family. The daughter, Charlotte, wife of Charles Kobogum, through whom complainant derives title, and on whose behalf this suit is chiefly brought, is, as her husband is, of unmixed Indian blood, and was, when her father died, and appears to have continued, a member of the tribe.

It appears distinctly that the mother of Charlotte was married to Marji Gesick, and that he lived with her as his wife for several years, and recognized Charlotte as his daughter. It also appears that the marriage was such as was recognized by Indian usage as marriage in contradistinc-

tion to a purely temporary relation. It also appears that Marji Gesick had another previous wife living when he married the mother of Charlotte, and there may be some doubt whether he had broken off all relations with her. There may also be some doubt whether there was full proof that he was actually married to the former wife, but in our view this is not very important. Assuming that the former marriage existed, it is claimed by the defence that all Indian marriages, being subject to summary divorce, must be deemed invalid, and that at any rate a second marriage during the first, must be held void, and the offspring illegitimate.

It is no doubt true that among civilized nations polygamy is very justly discarded, as a barbarous usage which is inconsistent with true civilization. If the Indian tribes were governed by the laws of the State, and their marriages covered by those laws, the result would follow as claimed. But the Indian tribes at the time now under consideration did not derive their right to occupy the country from the State. They were recognized by the United States as tribes capable of making treaties and of regulating their own internal affairs. In the absence of any determination by the United States by treaty or otherwise on the subject, they have as complete power to determine their own domestic relations as any other organized community would have, and those who were recognized by Indian usage as married persons must be so regarded by us, and the children of such marriages cannot be deemed illegitimate without violating every principle of justice. There are undoubtedly some decisions which undertake to apply to Indian relations the rules which belong to the jurisprudence of the states within which the tribes were situated, but we cannot think such precedents are safe guides, and they certainly do not express the prevailing sentiment on the subject. The question is not a new one, and the decisions generally sustain the only rule which is consistent with the principle that marriages which are valid where made, and not in fraud of any other jurisdiction, are valid everywhere. The validity of Indian

marriages, in spite of their capacity of dissolution by the parties, and their other peculiarities, is recognized in the following cases. *Wall v. Williamson* 8 Alabama 48; *Wall v. Williams* 11 Alabama 826; *Johnson v. Johnson's Adm'r* 30 Mo. 72; *Boyer v. Dively* 58 Mo. 510; *Morgan v. McGhee* 5 Humph. 13; *Jones v. Laney* 2 Texas 342. The general doctrine as to respecting tribal usages is also recognized in *U. S. v. Shanks* 15 Minn. 369; *Dole v. Irish* 2 Barb. 639; *Hastings v. Farmer* 4 Comst. 293.

The English ecclesiastical courts administered some remedies which could not well apply to marriages entirely outside of English law. But the courts generally, even while recognizing such exceptions, do not dispute the validity of marriages which have those peculiarities. In the case of *Armitage v. Armitage* L. R. 3 Eq. 343, where the question arose concerning the right of the daughter of a white man married in savage fashion in New Zealand to be treated as an Englishwoman, the vice chancellor (afterwards Lord Hatherly) while treating the evidence both of the father's citizenship and of the marriage in fact as insufficient, remanded the cause for further proofs on both of these questions, and was evidently disposed to a favorable view, although one of the parties was civilized. In *Ardesur Cursetjie v. Peroxeboye* 6 Moore's Ind. Appeals 348, where a question arose concerning the power of Indian courts exercising ecclesiastical jurisdiction to enforce some matrimonial rights only administered in that jurisdiction, it was held that these remedies were inconsistent with Parsee marriages, and therefore could not be enforced, but the marriages themselves were held valid and subject to the Parsee rules. A still more decisive class of cases is found in the English courts where until Jews were fully emancipated from their former disabilities they were treated as a community of alien people although living in England. It was uniformly held that Jewish marriages with all their incidents and qualifications were to be governed entirely by Jewish usage, and were valid if so conforming. The case of *Lindo v. Belisario* 1 Hagg. Con. Rep. 216, decided by Lord Stowell and affirmed

on appeal, contains in the text and notes a very full and elaborate treatment of the subject, and the court very clearly distinguishes between the validity of the marriage for all legal purposes, and its subjection to ecclesiastical remedies. *Goldsmid v. Bromer* 1 Hagg. Con. Rep. 324, recognizes the same rule as to Jewish marriages.  See also *Ruding v. Smith* 2 Hagg. Con. Rep. 385.

This exceptional position was one of the few remnants of the ancient practice which recognized not only different local customs, but different customs among different races and classes.   Both Jews and Quakers were excepted from the marriage act of 4 Geo. IV, and both were left to be governed by their own usages. 2 Steph. Com. 236, 239. The Jewish disabilities were so peculiarly onerous as to shut them out from most civil franchises. 2 Steph. Com. 381. And it appears that during the early period between the conquest and their banishment by Edward I, they had not merely the right to their own usages, but separate courts to adjudicate upon them, and that their laws of inheritance were not by primogeniture but in coparcenary, and their widows were endowed, but not by a common-law right.   Molloy de Jus. Mar. book 3 ch. 6.   In India where there are many natives under British rule it is pointed out by Mr. Guthrie in his notes to Savigny's Private International Law (note A to p. 16) that most of the Indian laws are personal and not local, and that the courts enforce the rules of each class among its own members.

The liberal application of rules of comity under the modern custom of nations has placed the domestic rules of uncivilized people on the same footing with those of civilized people as to rights accruing under them, and as to the legal recognition of private relations among their own people.   It would be regarded as offensive for any civilized nation to question the legitimacy of orientals who are legitimate at home, and there is more reason for respecting the rights of people who are lawfully within our own borders under rights which the State could not control.   The question does not arise here whether our laws would tolerate

the continuance under our jurisdiction of an alien system. These Indian tribes, as already suggested, derived their right to live here from the stipulations of the United States Government, under treaties still in force when all these rights accrued. Their relations were the same as if not within the State at all.

If there were any doubt upon this subject, it might be settled by the action of the United States Government in dealing with them. Most of the early treaties and some of the later ones, with the Indians in this State, as well as with other tribes, expressly recognized Indians as having heirs, and conveyed estates using those terms. The large provisions made not only for full blooded Indians but for half breed children were, in many instances, if not in most, made when the only marriage was an Indian marriage between the parents. This is common knowledge. There is no instance which we have been able to discover where any distinction was ever sought to be raised between the children of different kinds of marriage. And everyone at all familiar with local history knows that many of our honored and respected citizens have sprung from Indian marriages, the full validity of which no one ever questioned.

In my opinion Charlotte Kobogum was a lawful heir of her father. It appears that his other children all died, and we think the testimony indicates they all died before him. There is some testimony concerning the existence of a son of one of his daughters, but there is no testimony that she was married, and his name would seem to indicate a mixed origin. He has set up no claims, and we do not think there is enough to disturb the condition of Charlotte Kobogum as sole heir. The circuit judge was of opinion that there was no sufficient evidence that this young man's grandmother was wife of Marji Gesick. There is certainly no evidence that he is a legitimate descendant, or that he has any claim.

The question then arises to what extent, if any, has the delay of Charlotte Kobogum prejudiced her rights? Compo,

the complainant, stands in the same equities, and therefore her case governs his.

When her rights accrued she was a married woman belonging to an Indian tribe, and entirely uneducated, and ignorant of the laws of Michigan and of business. She seems to have acted with some degree of promptness in going to Mr. Everett, who was the agent that first dealt with Marji Gesick, and who knew of her equities although out of the company at this time. Mr. Everett brought her claim to the attention of the officers of the company in New York, and showed them the evidence on their own records of its validity. They did not recognize its justice, but it does not appear that they ever brought it to the attention of the company or of the board of directors. This happened in 1865, when the mine was paying large dividends and had no need of further calls. On the contrary it had paid dividends largely beyond the entire par of the shares. At the time of this application there was a considerable amount of money which should have been placed to the credit of this interest. During the succeeding interval she brought no suit, but in 1869, 1870 and 1871, had a lawyer employed to press the claim, and he seems to have done something towards urging it in correspondence with Mr. Brown at Cleveland. It was not until 1871 that the policy was adopted by the United States of dealing with the Indians on any other footing than as independent tribes, and the law changing that policy for the future expressly saved all existing treaties. 16 L. U. S. 566. The United States had not at that time fulfilled all of their treaty obligations to the Lake Superior Indians, and they were still receiving the benefit of appropriations from the Government for some tribal purposes, at the time when she assigned to Compo. There is nothing to show that her actual as well as legal tribal relations had ceased. Both she and her husband were sworn through an interpreter, and this unsatisfactory method has no doubt created some of the difficulties in the record.

It also appears that during most of their corporate exist-

ence the defendants have had no one at Marquette authorized to deal definitely with claims of this kind, or to consider them. The company's officers are non-residents, and the western agent seems also to have had his principal office in Cleveland. While the company could be sued here, it is evident that any one desiring to negotiate on important matters must have gone beyond the State to do it.

While the company has paid and distributed dividends annually, amounting in the aggregate to several millions of dollars, it has also retained large sums not so distributed, and is earning annually such sums as would not make it difficult to meet any obligations to complainant, without injustice or trouble to the share-holders.

I do not see that there has been any laches which was culpable; neither is there anything out of which an equitable estoppel can arise. I think complainant is entitled to the share of the property sold to Marji Gesick.

But while the principle of the decree below is just, I think the manner of providing for it is not correct.

Marji Gesick purchased an interest in what was designed to be a mining property, and one which corresponded in its proportion to the division of interests in a joint stock company. He could not therefore by such purchase obtain any interest inconsistent with its peculiar uses. While in a technical sense the agreement made him a tenant in common, it was in property which equitably resembled personalty more than realty, and which it was agreed by the articles should be so treated. His interest is therefore really the same as that of any other stockholder, and it should be given to him either as stock or in the value of stock. As the statute allows an increase of capital, there is no reason why stock should not be given. The nature of the interest precludes any right of partition as tenant in common. The defendant is liable as a trustee and not as a co-tenant.

While there may be in some cases an accounting from a trustee for an indefinite period of time, yet in my opinion it must be a peculiarly strong case which would allow such an accounting for dividends to go back as many years as

would be warranted by the decree below. The loss of dividends is the only loss which complainant has suffered. While defendant was bound to respect complainant's rights, I am not satisfied that there has been any intentional bad faith. Under such circumstances I think the statutory rule as to mesne profits, in analogy with the limitation of actions of assumpsit at common law, furnishes a fair equitable standard of liability. If complainant had appeared on the books as a share-holder, there would be some difficulty in maintaining an action for any more. The previous dividends earned wiped out any possible claim for assessments, and there is nothing to complicate the accounts. I think he should have a decree for the same percentage on his share of the capital which was distributed in the year 1873 and each subsequent year, with interest on the back payments. As the capital is fixed at $600,000 this can be easily computed, and will require no further inquiry.

I cannot therefore concur in reversing entirely.

COOLEY, J. I have been unable to take the same view of this case that is taken by my brother Campbell.

Complainant claims certain rights in the Jackson Iron Company as assignee of Charlotte Kobogum, who if she ever had any such rights succeeded to them as heir at law of Marji Gesick, a Chippewa Indian. It becomes therefore essential for him to show that Charlotte was the daughter of Marji Gesick and was born to him in lawful wedlock.

The evidence for complainant is that Marji Gesick went to an Indian girl named Susan and asked her to go and live with him as his wife, and that she assented and did live with him for a time and Charlotte Kobogum was the fruit of their intercourse. Afterwards he took another woman to live with and Susan another man, and both had children in their new relations. The parties during all this time had kept up their tribal relations, and we may infer from the evidence that such arrangements as these parties formed was all the marriage that was known to the customs of the tribe. It is therefore contended that we must recognize it

as a valid marriage for all the purposes of heirship ; and it is said that, according to the course of dealing of the federal government with the Indians, it would be considered sufficient.

It appears distinctly, however, that before taking Susan, Marji Gesick had taken another woman to live with him, and that she had borne him children, and was still living when the arrangement with Susan was made. If he was married to this woman, we cannot hold the relations with Susan to be those of marriage unless upon one of two grounds: 1. That polygamous marriages by Indians, when recognized by their customs, must be deemed valid ; or 2. That the separation of the Indian husband and wife without intent to renew their marital relations, must be deemed a complete divorce which would entitle them to marry again.

Complainant contends that the arrangement with Susan constituted the first marriage of Marji Gesick, and this view is understood to have been taken by the circuit judge. But the conclusion is reached upon the absence of evidence to show a distinct agreement of marriage between Marji Gesick and this first woman ; in other words, by bringing their relations to the test of the laws which govern Christian nations. But this test my brother Campbell does not accept. In his judgment that is a sufficient marriage between Indians which would be recognized by the customs of their tribe. And there is no doubt whatever in my mind that the evidence of the first marriage, according to Indian custom, was quite as good as that of the second. That the parties lived together as husband and wife and were recognized as such by the tribe is beyond any question ; and even Charlotte Kobogum testifies distinctly that this first woman was her father's wife. Of course she had no personal knowledge on the subject, but she knew what was the general understanding of their acquaintances, and has testified to it. And it would be a singular state of things, under a custom for parties to take each other for husband and wife at pleasure, and dissolve their relations at pleasure without any ceremony whatever, if the legality in law were to be made to depend on some-

body having been present to hear their conversation, and know whether they used the word marriage or not. If we recognize at all these polygamous and temporary marriages we must of necessity assume that the marriage is constituted by the mere living together of the man and woman in the relation which the tribes recognize as that of matrimony. That I understand to be the conclusion of my brother Campbell; and according to that view the validity of the first marriage is beyond question.

If then we admit that Charlotte Kobogum was born in lawful Indian matrimony, either because her father had a right to have two wives at once, or because when he took the second he dissolved relations with the first, there would still appear to be a fatal defect in complainant's case unless he has shown that the issue of the first marriage of Marji Gesick—to say nothing of the issue of the third—had become extinct when Charlotte Kobogum assigned to complainant. For if any such issue were still living at that time, they must have been co-heirs with Charlotte, and they or the parties representing them must have been entitled, not only to share in the inheritance, but to be made parties to this suit.

That there was a grandchild of Marji Gesick by the first marriage, still living when complainant acquired his right, is proved. But it is said there was no evidence that this child was born of a valid marriage between his father and mother. This is perfectly true ; but it is equally true that there is not the slightest evidence that he was not. It seems to me there is confusion of ideas and principles here ; and that all through this case the endeavor of complainant has been to have the rights of Charlotte Kobogum tested by Indian customs, and those of everybody else by the customs of Christian nations. It is easy in that way to make her out legitimate and to suggest illegitimacy in the case of all others ; but it is, as I think, a very illogical as well as a very unfair method. I do not understand that the United States Government, upon whose course of dealing with the Indians so much reliance has been placed, has ever, in order

50 MICH.—38

to ascertain who were legal heirs of Indians, entered into investigations to ascertain just what talk or bargains preceded their sexual relations, in order to judge therefrom whether they were or were not meretricious. Where marriage and heirship have been found recognized by the Indians themselves, the Government has recognized them; and it could not well do otherwise, for in case of a tribe having customs of marriage like those disclosed here, any inquiry that went beyond the understanding of the parties themselves and of their acquaintances would be simply absurd.

But it is said that this grandson of Marji Gesick by his first marriage has made no claim. Reference to the record, however, will show that he is not made a party to the suit. Perhaps if he had been made a party he would have asserted a claim. Where presumptively a person appears to have a right and to be a necessary party to a suit, I do not understand that it is any excuse for the failure to bring him in, that he does not appear to have made a claim. How do we know what the fact is? No issue is made or tendered on that point; the person chiefly concerned is not put in position to have any issue made upon his rights. Complainant simply ignores this grandson; and then because the case, as he sees fit to present it, does not show that the grandson makes a claim, he would have us infer that he has never made any in fact, and probably because he was illegitimate. But the law does not deal with the rights of absent parties in that way. The law permits the court to pass upon their rights when they are before it, and not till then.

But there may be a reason for the failure of this grandson to assert rights which I do not think it would be for the interest of complainant to urge. If the grandson had taken legal advice respecting his rights, it seems to me that counsel must have told him that by the well settled rules of equity established by the decisions of this Court, all rights in the descendants of Marji Gesick were lost by lapse of time before this suit was instituted.

The services of Marji Gesick which are the foundation of complainant's equity were rendered in 1845. The defendant corporation was formed in 1848, and Marji Gesick then became entitled to his share in the stock if ever. He lived for ten years or more after that, and is not known to have made any claim. Charlotte Kobogum as heir made a claim in 1864, and put her interest in the hands of a lawyer who presented the claim to the president of defendant, by whom it was repudiated. Nothing further was done about it until 1871, when claim was again made through a lawyer, but without result. Eight years later complainant acquired his assignment. This was thirty years after the right of Marji Gesick accrued, and fifteen years after it had been distinctly repudiated.

There is not in our reports a case in which so stale a claim has been recognized, and there are several in which a less serious lapse of time has been held fatal. *Van Dyke v. Campau* 15 Mich. 371; *Newberry v. Iron Co.* 17 Mich. 141; *Russell v. Miller* 26 Mich. 1; *Mc Vicar v. Filer* 31 Mich. 304; *Harlow v. Iron Co.* 41 Mich. 383; *Allen v. Allen* 47 Mich. 79. It is said Charlotte Kobogum was a married woman and an Indian presumably not well informed. But the marriage of a woman is no disability in this State, and she seems to have been sufficiently informed to put her claims into the hands of a lawyer. If personal ignorance can be set up as an excuse for not pressing one's legal rights, I do not know why the privilege should belong specially to Indians, or why it should continue after counsel are employed.

This is a speculative claim, bought up and sued when the generation living when it accrued had passed away. Its validity in the hands of complainant depends upon an inquiry into the domestic relations of individual Indians who seem to have lived together almost as promiscuously as the beasts, and a determination of the question which temporary arrangement was most legitimate according to savage customs. It would be bad enough to be compelled to make such a determination cotemporaneously with the

facts, but to be required to enter upon it thirty years or so afterwards can only be justified by a necessity for the protection of legal rights or plain equities. And the party claiming such rights or equities ought to have some better excuse than any which is suggested here.

If this suit prevails, there is nothing to prevent the grandson of Marji Gesick bringing suit on his own behalf and recovering. This suit cannot cut off his rights, and the decree cannot protect the defendant. He can probably excuse his delay by showing his ignorance, and his excuse will be better than that of Charlotte Kobogum if he never employed counsel.

The circuit judge may have supposed the previous decision made by us when the case was up on demurrer controlled his action on the main facts; but that was not the intention. I think the *prima facie* case the complainant made by his bill fails on the evidence, and that the bill should be dismissed.

GRAVES, C. J.   I concur in the result.