(121 App. Div. 309.)

### PETERS v. TALLCHIEF.

(Supreme Court, Appellate Division, Fourth Department. September 25, 1907.)

1. INDIANS—LANDS—ALLOTMENT.

Laws 1854, p. 369, c. 175, § 1, permitted allotments of land to Tuscarora Indians by their chiefs or headmen. Indian Law, Laws 1892, p. 1575, c. 679, § 7, provides that any nation of Indians owning land may partition it among the individuals and families of such nation, and section 90, p. 1596, provides that the chiefs of the Tuscarora Indians shall allot to any Indian making application and not possessing land so much of the tribal lands as they shall deem just. Section 2, p. 1574, expressly authorizes an Indian to take, hold, and convey property the same as a citizen. De-

cedent, a Tuscarora Indian, occupied premises upwards of 28 years, claiming to own the same under an allotment, and at his death petitioner and her husband, both Indians, occupied the premises, the same having been devised to the husband, who was decedent's son, and after the death of petitioner's husband she continued to occupy the premises with her infant child for about two or three weeks, when she was ousted by defendant, a daughter of decedent. *Held*, that petitioner was entitled to possession of the lands as against defendant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indians, § 50.]

**2. SAME—JURISDICTION OVER INDIAN RESERVATIONS.**

Under Indian Law, Laws 1892, p. 1575, c. 679, § 5, providing that any demand or right of action by an Indian, jurisdiction of which is not conferred on a peacemakers' court, may be enforced in any state court the same as if the parties were citizens, a Tuscarora Indian may maintain an action in a state court for the possession of land on the Tuscarora Indian reservation, which, when dispossessed, she was holding in accordance with the customs recognized by those Indians; the Tuscarora Indians having no peacemakers' court or other tribunal to which she might resort for relief.

McLennan, P. J., dissenting.

Appeal from Niagara County Court.

Summary proceedings to recover the possession of certain premises by Linnie L. Peters in behalf of herself and her infant daughter, Irene Peters, against Allie Tallchief. From a judgment of the County Court (102 N. Y. Supp. 972), reversing a final order of a justice of the peace, awarding possession of the premises to her, Linnie L. Peters appeals. Judgment of the County Court reversed, and final order of justice of the peace affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

William E. Lockner, for appellant.

W. Luther Reeves, for respondent.

KRUSE, J. The proceeding was brought to recover the possession of certain lands, situate on the Tuscarora Indian reservation, in the town of Lewiston, Niagara county, consisting of about 23 acres of farm land, with buildings thereon, and occupied for many years by Jeremiah Peters, a Tuscarora Indian, up to the time of his death in March, 1900. Both the petitioner and the defendant are Tuscarora Indians. The defendant is his daughter and the petitioner is his daughter-in-law. No evidence was given on behalf of the defendant, but she contended, and now insists, that the courts of this state have not jurisdiction, for the reason that the parties to the controversy are Indians, and that the premises are Indian tribal lands. The justice of the peace overruled her objections, and awarded possession of the lands to the petitioner, but, upon appeal, the County Court reversed the judgment, and the petitioner now appeals to this court.

It appears that Jeremiah Peters occupied the premises for upwards of 28 years, claiming to own the same under an allotment thereof made to him by the chiefs or head men of the Tuscarora Indians. After the death of Jeremiah Peters, which occurred in March, 1900, his son, the petitioner's husband, occupied and claimed to own the premises, the same having been devised to him by his father. The

petitioner occupied the premises with her husband until the husband became insane in 1905, when he was confined in an asylum, where he remained for about a year, when he died, his death occurring in March, 1906. After his confinement in the asylum, his wife continued to occupy the premises with their infant daughter until about two or three weeks after the death of her husband, when she was ousted by the defendant. It further appears that, while the petitioner was temporarily absent from the house situate upon the premises, the defendant broke into the house and took possession of the same. Upon being asked to give up possession of the premises and the things in the house, the defendant refused to move from the house, or even to give up possession of the petitioner's furniture and goods, consisting of a stove, bedstead, dishes, cupboard, sewing machine, and some chairs. The petitioner claims she was entitled to the possession of the premises; that, in addition to her dower, she had the widow's quarantine right, which continued for 40 days after the death of her husband (Real Property Law, § 184; Fowler on Real Property, 439, 440), and was the guardian in socage of her infant child (Domestic Relations Law, § 50), which enabled her to recover possession of the infant's lands (Foley et al. v. Mutual Life Ins. Co., 138 N. Y. 333, 339, 34 N. E. 211, 20 L. R. A. 620, 34 Am. St. Rep. 456).

It is unnecessary to define or classify the precise right that Jeremiah Peters had in the land under the allotment so made to him. That it was a substantial right entitling him to the exclusive possession thereof seems clear. As early as 1854 the Legislature, evidently recognizing the change in the manner and custom of these Indians, permitted allotments of this character to be made by the chiefs (Laws 1854, p. 369, c. 175, § 1), and such an allotment is now sanctioned by the Indian law (Laws 1892, pp. 1575, 1596, c. 679, §§ 7, 90). The same law expressly authorizes a native Indian to take, hold, and convey real property the same as a citizen (section 2), and the right of an Indian under such an allotment of tribal lands has been recognized and protected by our state courts (Jimeson v. Pierce, 78 App. Div. 9, 79 N. Y. Supp. 3). The right of the son and his family to occupy and enjoy the lands so devised to him by his father does not appear to have been questioned by the chiefs or any one else, save the defendant; and she does not seem to have asserted any claim to the property until after the death of her brother. In the absence of any right thereto, I think it clear that the defendant was not justified in ousting the petitioner from the premises as she did, and that the petitioner is entitled to the possession of the lands as against the defendant. The undisputed evidence shows that the defendant intruded into and squatted upon the premises without any right thereto.

The more serious question, however, is whether the petitioner may resort to the courts of this state for the enforcement of her right against the defendant. If she may not have redress in our courts, she appears to be remediless, since the proof shows that, unlike some of the other Indians, the Tuscarora Indians have no peacemakers' court or other judicial tribunal of their own to which the petitioner may resort for the enforcement of her right. While these Indians may voluntarily submit matters in controversy to their chiefs, neither party

to a controversy can be compelled to do so, as the proof shows, and there is no claim that the defendant has offered to so submit the matter, evidently for the very obvious reason that she is now in possession of the property, and there is no need of submitting the matter in controversy for determination if she can hold and enjoy the property thus wrongfully taken from the petitioner without being amenable to judicial proceedings. I am, however, of the opinion that the defendant is not beyond the reach of our state courts, and that the petitioner may resort thereto for the enforcement of her right to the possession of these premises against the defendant. Section 5 of the Indian law provides as follows:

"Any demand or right of action, jurisdiction of which is not conferred upon a peacemakers' court, may be prosecuted and enforced in any court of the state, the same as if all the parties thereto were citizens."

As regards certain Indian reservations having courts of their own, provision is made in the Indian law of our state for the enforcement of the determinations of such Indian courts by appropriate proceedings in our state courts (section 53), as was done in the case of Jimeson v. Pierce, above referred to. Such courts have long been maintained by the Seneca Nation of Indians, and are recognized in our Indian law (article 3, c. 679, p. 1582, Laws 1892), but no such provision is contained therein regarding the Tuscarora Indians. While the record itself contains little, if anything, beyond what has already been stated regarding the status of the Tuscarora Indians, it is evident that they are farther advanced in civilization and their tribal relations less intact than that of the larger reservations. In the report of the committee of the Assembly made in 1889, to which both counsel refer, it is stated that they are more enlightened and better educated than any other reservation in the state. They came originally from North Carolina, and acquired their lands by purchase from the Seneca Nation of Indians and the Holland Land Company. These lands, consisting of about 6,000 acres, have been quite generally allotted among the individual Indians, who have occupied and improved the same. To leave these Indians without adequate means for the protection of their rights, thus permitting the indolent and the evil disposed Indians to wrong the thrifty and the honest with impunity, presents a situation so deplorable and disastrous in its consequences that we ought not to reach that conclusion, if it can be avoided. I realize that, if the deficiency is in the law itself, the remedy is with the lawmaking power, and not the judiciary; but the very purpose of the statute in permitting an Indian to resort to our courts in the first instance, or to enforce a determination of a peacemakers' court, was to afford an adequate remedy by a proper judicial proceeding. This is not a case where the petitioner's right of action contravenes some custom or law of the tribe to which she belongs. The proof shows that this property was being held and enjoyed quite in accordance with the customs and practices recognized by the Indians themselves. The question here presented is whether she may resort to our courts to vindicate such right. In Jimeson v. Pierce, supra, where the right to hold in severalty lands upon the Cattaraugus Indian

Reservation was upheld, Mr. Justice Williams, speaking for this court, says:

"For many years the Legislature has passed laws for the protection of the rights and property of these Indians and the enforcement of such rights under the laws so passed. We see no reason why such laws should not be regarded as valid, and should not be enforced. While it has been frequently held that the Indians cannot come into our courts and bring actions in the absence of acts of the Legislature enabling them to do so, yet it has always been held that they can do so under enabling acts when they have been passed."

I think the petitioner's case is within the provisions of the statute, and that the judgment of the County Court should be reversed, and the final order of the justice of the peace should be affirmed, with costs. All concur, except McLENNAN, P. J., who dissents.

McLENNAN, P. J. (dissenting). It seems to me that the decision about to be rendered in this case is not supported by authority; that no well-considered decision can be found which holds that the courts of this state have jurisdiction to settle disputes between Indians residing upon their respective reservations, and which relate solely to the occupancy or possession of the lands of such reservations; and that the reasons assigned for such decision, as recited in the prevailing opinion, are not sufficiently forceful to justify the same.

The facts are stated in the opinion of the court with substantial accuracy, and need not be repeated. It may be assumed, as there pointed out, that plaintiff's rights, if measured by the laws of this state applicable to the possession of real property as between citizens, have been flagrantly violated by the defendant; that the equities, as defined by our system of jurisprudence, are with the plaintiff; and that any court should be glad to give relief in the premises if it has the power so to do. The question, however, presented by this appeal is not one of equity; but is: Have the courts of this state jurisdiction in the premises? Or, to be more specific: Has a justice of the peace jurisdiction to determine as between two Indians, both members of the Tuscarora Tribe or Nation and residing upon its reservation, who of such Indians is entitled to the occupancy and possession of a certain part or portion of such reservation? This is a summary proceeding for the recovery of real property, instituted pursuant to the provisions of title 2 of chapter 17 of the Code of Civil Procedure. It was commenced and prosecuted in all respects precisely as if the controversy existed between citizens of this state and related to property exclusively within its jurisdiction. If a dispute between Indians such as is here involved may be settled by our courts, it necessarily follows that all rights or causes of action given by the sections of the Code relating to "summary proceedings to recover the possession of real property" are available to all Tuscarora Indians, and to the members of every other tribe or nation of Indians within the state where a peacemakers' court has not been established and given jurisdiction of the subject-matter, notwithstanding such Indians reside upon their respective reservations, and the dispute between them arises over the possession of a part of such reservations. If a justice of the peace has jurisdiction as between two Indians to determine that one has "unlawfully entered into or squatted upon real property [a part of the

reservation] without the permission of the other," to award possession thereof to one as against the other under subdivision 4 of section 2232 of the Code of Civil Procedure, as claimed by the appellant, and to enforce his judgment in the premises, such justice has equally jurisdiction to determine all disputes arising between Indians respecting the possession of the lands of their respective reservations for any of the causes enumerated in the sections of the Code embraced within the title to which attention has been called; and, if such power exists, it is readily seen that for one cause or another a justice of the peace of a town in which a reservation belonging to Indians is located may award the possession of any part of such reservation to particular Indians without regard to the customs of the tribe or nation or to their laws, which have governed the occupancy of their lands from time immemorial. The claim that the courts of this state have such jurisdiction it seems to me is preposterous. The Legislature never intended such result, and any enactment susceptible of such interpretation would be at variance with the settled policy of the state in its treatment of Indians residing upon reservations within its borders. The various nations or tribes of Indians have ever been regarded by the state as separate and distinct sovereignties, having the power to negotiate treaties with it, which is the broadest recognition of such sovereignty. As was said by Judge Mullett more than a half century ago, in Dole v. Irish, 2 Barb. 639, 642:

"Still our intercourse with them has been in their national capacity. We have regarded them as nations having some sovereign power, and have permitted them to exercise that power over their own internal affairs. We have not attempted to extend our laws to their domestic relations, or to regulate the manner of their acquiring, holding, or conveying property among themselves. We have never applied our doctrines of descent or distribution to their property, nor subjected them to our laws relating to wills, intestacy, or administration; nor are they applicable to their state of society. So far from interfering with their pecuniary affairs, or subjecting their persons or property to the civil jurisdiction of our courts, we have declared that no action shall be maintained against one of these Indians on his contract."

The whole trend of judicial decision by the courts of this state has been to like effect, practically that we have no jurisdiction over the lands of Indians or to regulate their internal affairs, except as given us by treaty, or such as may be exercised under the police power of the state for their protection, or is reasonably necessary for our protection against their unlawful acts or encroachment. The attempted exercise of jurisdiction by the justice of the peace in this proceeding is in violation of the principle enunciated in Dole v. Irish, supra. Such justice did attempt "to extend our laws * * * to regulate the manner of their [the Indians'] acquiring, holding, or conveying property among themselves." We are not concerned as to how or in what manner the dispute between the parties to this proceeding might have been settled if relegated to the courts or customs of the Tuscarora Nation. Whether it would have been settled more or less in accordance with the principles of justice it is not important to inquire. By the brief of counsel in the case of Dole v. Irish, supra, we are told "that it is a custom among the Seneca Indians, which has existed from time immemorial, when one of the said nation dies, for the relatives of the de-

ceased to meet at his last place of residence 10 days after his death, and divide his property among his relatives," which I assume includes the right of possession. Such method of distribution of a decedent's estate had the merit, at least, of being speedy, final, and inexpensive. We may fairly assume that during the century or more that the Tuscarora Tribe of Indians have occupied their reservation in Niagara county some means has existed for the settlement of disputes between themselves, especially those relating to the occupancy of their tribal lands, which has been reasonably efficient and satisfactory to all concerned. At all events, so far as we can discover, this is the first time that an attempt has been made to settle such disputes in our courts, and such attempt cannot be considered as entirely satisfactory, for it is apparent that the costs and expenses already incurred in this proceeding, and which are allowed by our Code will amount to more than the entire value of the right which it is brought to enforce. This suggestion leads to the query whether or not if final judgment is rendered in plaintiff's favor, adjudging that she is entitled to the possession of the premises in question, such right of possession may not be decreed to be sold and the proceeds applied in payment of the services rendered by her attorney and to which he is entitled by the provisions of the Code under which the proceeding is brought. It would, indeed, be an anomalous situation if such proceeding might be instituted under the sections of the Code to which attention has been called to recover the possession of real property, a valuable right, and, if successful, the costs given by the same statute could not be collected. Yet we fancy it will hardly be claimed that execution could lawfully be issued against either of these parties for the collection of the costs given by the statute. In such case would the provision of the judgment awarding possession of the real property be enforcible, and not the provision awarding costs? Such suggestion indicates the incongruities which would result if it be the rule that our laws relating to the recovery of the possession of real property as between citizens are alike applicable to Indians and to their tribal lands. We can conceive of no good reason for the adoption of such rule, unless made necessary by express statutory provision. I do not believe there is any statute which is properly susceptible of such interpretation. As was said in Dole v. Irish, 2 Barb. 642:

"Farther exercise of jurisdiction may still be necessary, until all vestiges of Indian power and Indian rights shall be brought under the broad shield of our civil jurisprudence; * * * but when, and how, it shall become necessary or proper to seize on this dilapidated Indian sovereignty, are questions to be decided by the Legislature, and it does not become the judiciary voluntarily to march forward in such enterprises."

It must be conceded that the justice of the peace in the case at bar was wholly without jurisdiction of the parties or of the subject-matter of the controversy, unless expressly given by statute. Section 2861, Code Civ. Proc. The only legislative enactment by which it is claimed jurisdiction is conferred is section 5 of the Indian Law, which provides:

"Any demand or right of action, jurisdiction of which is not conferred upon a peacemakers' court, may be prosecuted and enforced in any court of the state, the same as if all parties thereto were citizens."

It would seem clear that such provision has reference only and relates solely to an Indian nation in which a peacemakers' court has been established, and was intended to cover only such disputes arising between the members of such nation as such peacemakers' court, through inadvertence or otherwise, had not been given jurisdiction of. The old methods of adjusting such disputes having been abrogated by the creation of a peacemakers' court, it is entirely reasonable that any matter, jurisdiction of which was not given to such court, might be referred to our courts for settlement. The Legislature did not intend by the enactment of such section to oust all other Indian nations in which no peacemakers' court has been established of jurisdiction over their internal affairs. Yet such is the broad scope of the decision about to be rendered. Concededly no peacemakers' court has been established in the Tuscarora Nation, and so, of course, no jurisdiction of anything has been or can be conferred upon it. Yet it is urged that the result of such situation is that the courts of this state are given jurisdiction of all matters relating to the affairs of such nation because of the language of the section. If by such section the courts of this state are given any jurisdiction, even the slightest, their jurisdiction is absolute and extends to every controversy which may arise between the members of such tribe, because such jurisdiction has not been conferred upon a peacemakers' court, for, as stated, no such court has been created.

The majority of this court interpret section 5 of the Indian law above quoted to mean precisely what it would mean if its language were:

"In all Indian nations within the state in which a peacemakers' court has not been established, all jurisdiction by the members of such nations over their internal affairs is abrogated and is conferred upon the courts of this state."

It is absurd to suggest any limitation of jurisdiction of our courts over "any demand or right of action" in favor of an Indian, a member of and residing in a nation in which no peacemakers' court exists, if the words "peacemakers' court," as used in the section, apply to such nation the same as to one in which such a court has been established. If the meaning of section 5 is as claimed by a majority of the court, by that act the Legislature swept away every vestige of Indian sovereignty in all the nations within the state, except in the Seneca Nation, in which alone a peacemakers' court has been established; for, if jurisdiction of "any demand or right of action" existing between members of a tribe or nation is taken from it and conferred upon our courts, then indeed "all vestiges of Indian power and Indian rights shall be brought under the broad shield of our civil jurisprudence." The only peacemakers' court to which the section relates was established in 1868 in the Seneca Nation. It was created solely for their benefit and purposes. It came into existence by virtue of their amended constitution, "made and adopted in convention assembled duly called and organized in accordance with the provisions of the constitution of said nation, convened at the council house at Cold Springs, on the Allegany reservation, on the 22d day of October, A. D. 1868." In the preamble it is recited:

"We, the people of the Seneca Nation of Indians, residing at Cattaraugus, Allegany and Oil Springs reservations in the state of New York, * * * do make and establish the following constitution."

Such tribe or nation thereby voluntarily abrogated and abolished the customs which had existed in that nation for more than a century and by which the internal affairs of such nation had been regulated and the disputes and controversies between its members settled, and, in lieu thereof, by such amended constitution a peacemakers' court was created, its jurisdiction defined, and its method of procedure prescribed. Such amended constitution recognized the desirability of the co-operation of the state of New York in the carrying out and enforcement of its provisions, and it provided:

"The laws heretofore enacted by the Legislature of the state of New York, for the protection and improvement of the Seneca Nation of Indians; * * * shall continue in full force and effect as heretofore until the statutes of the state of New York shall be repealed or amended by the Legislature thereof."

Section 5 of the Indian law above quoted was not passed until 1892. Suppose that no peacemakers' court had been created before that time in any Indian nation, would it then be contended that the effect of such section was to oust all Indian nations and tribes within this state of jurisdiction to control and manage their internal affairs, to determine who shall occupy and possess their respective reservations, and to transfer jurisdiction of all such matters to the courts of this state? We think that with as much reason it could be urged that in such manner the distinguishing sovereign rights of all such nations, to wit, their power to control and regulate their internal affairs, might be transferred to the courts of this state, as to claim that by such section jurisdiction of the affairs of the Tuscarora Nation is conferred upon our courts simply because the section refers to a peacemakers' court in no manner connected with such nation, and which concededly was given no jurisdiction over their members or reservation.

If I appreciate the argument of the appellant in support of the proposition contended for, it seems to me to be unique. Apparently it is conceded that until the establishment of a peacemakers' court in the Seneca Nation, which was created by amendment to its constitution, all Indian nations within the state had exclusive jurisdiction in the management of affairs solely between themselves or such as related to the occupancy of their respective reservations, and that from time immemorial any disputes were settled in accordance with the customs, laws, or rules adopted by or recognized as in force by such nations. The Senecas, one of such nations, in convention duly assembled, determined to abrogate the customs which had controlled the settlement of disputes for a century or more, and, in lieu thereof, to create a peacemakers' court, to which all matters of difference between members of their nation might be referred for adjudication. Such peacemakers' court, as we have seen, was created by action of such nation and in all respects in conformity to its laws. No other nation or tribe of Indians assumed to establish such court, and all others were clearly unaffected by the amended constitution which created such court for and on behalf of the Seneca Nation. Yet it is urged that because of

the establishment of such court, and because of section 5 of the Indian law above quoted, the jurisdiction of all other nations of Indians within the state over their internal affairs was abrogated, and that the same was transferred to the courts of this state. If the proposition that a justice of the peace of a town within which the Tuscarora reservation is situated has jurisdiction to determine who of the members of such tribe shall occupy such reservation is sound, it applies with equal force to the Onondaga, the Oneida, and to every other nation or tribe of Indians within the state, except the Senecas, where alone a peacemakers' court has been established. In other words, the effect of the decision about to be rendered in this case is to hold that the courts of our state have jurisdiction to determine any and all controversies arising between Indians residing upon their respective reservations within the state of New York, outside of the Seneca Nation, in which a peacemakers' court has been established. Such a claim of jurisdiction, so drastic and farreaching, should, it seems to me, be supported by the highest authority before receiving the sanction of this court.

We are therefore led to inquire whether there are any judicial decisions which support the contention of the appellant in the premises. We will assume, for the purposes of this appeal, that the law, as stated by Mr. Justice Williams in the case of Jimeson v. Pierce, 78 App. Div. 9, 79 N. Y. Supp. 3, is correct. There it was said (page 13 of 78 App. Div., page 6 of 79 N. Y. Supp.):

"While it has been frequently held that Indians cannot come into our courts and bring actions in the absence of acts of the Legislature enabling them to do so, yet it has always been held that they can do so under enabling acts when they have been passed."

That statement of the law presents the whole question involved upon this appeal, viz.: Did section 5 of the Indian law authorize the plaintiff to come into our courts for the purpose of enforcing her alleged right, and to compel the defendant, against her will, to submit her rights to such jurisdiction? My contention is that the section has no reference to and confers no right upon a member of the Tuscarora Nation residing upon its reservation to bring an action in our courts against another member of such tribe against his will and protest.

None of the cases cited by appellant's counsel support the proposition contended for. In the case of Crouse v. N. Y., Penn. & Ohio R. R. Co., 49 Hun, 576, 2 N. Y. Supp. 453, it was simply held that where an Indian, a member of the Seneca Nation, comes into our courts to seek redress against a citizen of our state and is unsuccessful, a judgment for costs awarded against him may be collected out of his individual property. In the case of Jemmison v. Kennedy, 55 Hun, 47, 7 N. Y. Supp. 296, it was objected that the action, which was for assault and battery between two Indians, had been brought by attorneys other than the "attorney of the Seneca Nation of Indians," in violation of section 2, c. 150, p. 147, Laws 1845. It was held that such objection was not available because, by section 14, c. 365, p. 468, Laws 1847, it was provided that any Indian of said nation who had any demand or right of action which exceeded the amount which might

be awarded by the peacemakers was authorized to maintain and prosecute the same in the courts of this state, "in the same manner and with like effect as between white citizens." In the case of Singer Mfg. Co. v. Hill, 60 Hun, 347, 15 N. Y. Supp. 27, it was held that a citizen of this state might maintain an action of replevin against an Indian to recover property the possession of which such Indian had obtained under a contract of conditional sale. In that case it was held that the right of action arose upon the demand and wrongful refusal of the defendant to give up the property. The case of Johnson v. Long Island R. R. Co., 162 N. Y. 462, 56 N. E. 992, cited by appellant's counsel, can in no way be regarded as a decision in support of the proposition for which he contends. No decision has been called to our attention by appellant which holds that our courts have jurisdiction of a controversy such as the one here involved. The Tuscarora Indians from time immemorial, through their chiefs or head men, have had jurisdiction to divide their lands among the members of the tribe, and it seems to me clear that the courts of this state have not jurisdiction to issue a warrant of dispossession against a member of such tribe in an action between themselves and which might practically annul any allotment made by their chiefs or head men.

My conclusion of the whole matter is that the courts of this state have not jurisdiction as between members of the Tuscarora Nation to determine who shall occupy or are entitled to possession of its tribal lands; that section 5 of the Indian law, when properly interpreted and construed, does not confer or attempt to confer such jurisdiction; and that, if susceptible of such interpretation, it is void because of the treaty rights of the Tuscarora Nation of Indians.

It follows, according to my view, that the County Court was right in reversing the decree or judgment of the justice of the peace, and that the judgment appealed from should be affirmed, but without costs as against the appellant Indian, for the reason that this court has no authority to award costs in such case.