## HATCH et al. v. LUCKMAN.

## PEOPLE ex rel. HATCH et al. v. CARPENTER et al.

(Supreme Court, Special Term, Erie County. September 21, 1909.)

1. INDIANS (§ 12*)—TITLE TO LANDS IN RESERVATION.

By the convention at Hartford in 1786, the contentions between Massachusetts and New York over the ownership of the territory constituting Western New York were settled by New York ceding to Massachusetts her pre-emption rights to extinguish the Indian title to the land, and by Massachusetts in turn recognizing New York's political sovereignty over the territory. The Tonawanda tribe of the Seneca Nation of Indians occupied a portion of the territory, and in 1838 the several tribes of New York Indians concluded a treaty with the United States (7 Stat. 550), whereby the Indians released certain lands, including those on the Tonawanda reservation. In 1857 the Tonawanda Indians by treaty (11 Stat. 735, 12 Stat. 991) bought back a portion of the reservation, the lands to be taken by deed to the Secretary of the Interior in fee, to be held in trust for the Tonawanda Indians until the New York Legislature should designate some person of that state to hold the land upon a similar trust. An act being passed designating the State Comptroller to act in such capacity, the reservation was deeded to him and his successors in office by the Secretary of the Interior, "in fee for the Tonawanda band of Indians," etc. *Held*, that the old Indian title and right of possession was extinguished, and the Tonawanda Indians hold title by virtue of the deeds of conveyance; the political sovereignty of New York attaching to the whole reservation.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 12.*]

2. INDIANS (§ 5*)—STATUS AND DISABILITIES.

The Indians of New York do not possess the rights of citizenship and are regarded as wards of the state.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 5.*]

3. INDIANS (§ 32*)—LEGAL STATUS.

The sovereignty of the state having attached to the Tonawanda reservation, the Tonawanda Indians can claim no sovereignty of their own, superior to that of the state, by reason of their peculiar customs or tribal existence from immemorial times.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 57; Dec. Dig. § 32.*]

4. INDIANS (§ 18*)—TENTH DAY OR INDIAN DEAD. FEAST—DISTRIBUTION OF DECEDENT'S PROPERTY BY—VALIDITY.

The custom among the Tonawanda Indians, known as the Tenth Day or Indian Dead Feast, whereby relatives of a decedent and members of his tribal clan assembled on the tenth day after his death and agreed upon a distribution of his property, is not sanctioned as an Indian probate court by the Constitution or legislation of the state, nor recognized as having any legal existence.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 49; Dec. Dig. § 18.*]

5. INDIANS (§ 28*)—PEACEMAKERS' COURT—PROBATE JURISDICTION.

Indian Law (Laws 1892, p. 1575, c. 679) § 5, provides that any right of action, jurisdiction of which is not conferred upon a peacemakers' court, may be prosecuted and enforced in any court of the state, the same as if all the parties thereto are citizens. Section 47 provides that the Peacemakers' Court of the Tonawanda reservation shall have authority to determine all disputes between Indians residing on such reservation, whether arising upon contracts or for wrongs, particularly for encroachments on lands cultivated or occupied by one of them, etc., but the court shall not

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

118 N.Y.S.—44

award more than $100, exclusive of costs. *Held*, that the court has no equity powers, and is confined to cases where a money judgment not exceeding $100 can be awarded, and hence the Surrogate's Court has authority to grant letters of administration on the estate of a Tonawanda reservation Indian.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 21; Dec. Dig. § 28.*]

6. CUSTOMS AND USAGES (§ 3*)—REQUISITES.

To establish and give validity to a custom, it must be certain, reasonable, continuing from time immemorial, without interruption, and not opposed to or calculated to violate law.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 2, 6; Dec. Dig. § 3.*]

7. INDIANS (§ 15*)—LANDS—CONVEYANCE.

Under Indian Law (Laws 1892, pp. 1576–1596, c. 679) §§ 9–90, sanctioning allotments of land on the Indian reservations and expressly authorizing (section 2) a native Indian "to take, hold and convey real property the same as a citizen," a written deed·from one reservation Indian to another, possessing all the formalities sufficient to convey title to land between citizens, was sufficient to pass title.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 37–44; Dec. Dig. § 15.*]

8. TROVER AND CONVERSION (§ 48*)—MEASURE OF DAMAGES.

In trover for the value of crops removed from land, the measure of damages is the value of the crops removed, and not the rental value of the land on which they were grown.

[Ed. Note.—For other cases, see Trover and Conversion, Cent. Dig. § 260; Dec. Dig. § 48.*]

9. INDIANS (§ 32*)—PEACEMAKERS' COURT—JURISDICTION.

Indian Law (Laws 1892, p. 1585, c. 679) § 47, provides that the Peacemakers' Court of the Tonawanda reservation shall have authority to determine disputes between Indians residing on the reservation whether arising upon contracts or for wrongs, particularly for encroachments on lands cultivated or occupied by one of them, etc., but the court shall not award more than $100, exclusive of costs. *Held*, that the court has no equity powers, and is confined to cases where a money judgment not exceeding $100 can be awarded, and hence has no jurisdiction of an action relating exclusively to the disputed title to the lands of a decedent, and a writ of prohibition will issue against the court and plaintiffs attempting to litigate such an action.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 32.*]

10. INDIANS (§ 18*)—DESCENT.

The reasons for the recognition and enforcement of the ancient custom of the Indians that the clan and tribal relations of an Indian follow that of the mother, rather than that of the father, no longer obtain, and the Legislature, in passing Indian Law (Laws 1892, p. 1576, c. 679) § 8, providing that, except·as otherwise provided by law, no person shall settle or reside upon any lands owned or occupied by any nation, tribe, or band of Indians, except the members of such nation, tribe, or band, had the rule of the common law in mind; and where a wife of an Indian, belonging to another tribe, during all her married life lived with her husband on the reservation of his tribe without protest, their child, born· on the reservation, who had lived there during her whole life, and was the wife of a member of the tribe, must be deemed a member of the tribe, and entitled to inherit lands as heir of her father.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 18.*]

Action by Phœbe Hatch and another, as administrators of Thomas Skye, against William Luckman. Prohibition by the People, on the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

relation of William Hatch and another, against Corelius Carpenter and others. Judgment for plaintiffs in the first action, and writ granted in the second.

Le Roy Andrus, for plaintiffs in each case.
William H. Coon, for defendants in each case.

WHEELER, J. We deem it proper to dispose of each of the above-entitled actions in one opinion, as the main questions up for decision are the same in each case, and grow out of the same general transactions.

Thomas Skye was a Tonawanda Indian, living at the time of his death on the Tonawanda reservation, in this state. He owned by allotment or Indian title four parcels of real estate on the Tonawanda Indian reservation. Thomas Skye died on October 19, 1907; but on March 4, 1907, by formal deed of conveyance, he conveyed the lands in question to his son-in-law, William Hatch. On the same day Hatch gave back to Skye a lease of the lands in question for the term of five years. Thomas Skye had been legally married to Martha George, who was an Indian woman belonging to the Cattaraugus Tribe of the Seneca Nation of Indians. The only issue of that marriage was a daughter, the plaintiff Phœbe Hatch. Skye also left, him surviving, an illegitimate son, named James Skye, and three nephews, Stephen Skye, Cornelius Carpenter, and Simon Parker, three of the defendants in the second entitled proceeding.

It further appears that on the tenth day after the death of Thomas Skye, to wit, on the 29th day of October, 1907, certain members of the clan to which Thomas Skye belonged met at his last place of residence on the reservation and held what is known as the Tenth Day or Dead Feast, at which time the members of the clan present proceeded to appoint the said James Skye, son of Thomas Skye, and Cornelius Carpenter and Simon Parker, nephews of said Thomas Skye, administrators of his estate, with power to pay his debts by renting his lands, and proceeded to distribute his lands to certain persons. The parcel concerned in the action against Luckman went to Stephen Skye, Cornelius Carpenter, and Simon Parker, nephews; another tract to the same persons; a third tract to James, his illegitimate son; and a fourth parcel to Eliza Hiram, with whom Skye had been living at the time of his death in meretricious relations.

It will be noticed that, in this attempted distribution of Skye's real property, the rights of his legitimate daughter and natural heir at law, Phœbe Hatch, were ignored. It is claimed by the defendants that this course was justified by reason of an Indian custom prevailing and having the force of law on the Tonawanda Indian reservation, and that the laws of the state of New York do not control in the distribution and disposition of the estates of deceased Indians. We shall have occasion to refer later in our opinion to these Indian customs.

On the same day the Tenth Day or Dead Feast was held, two of the members of the clan, together with one Poodry, a witness of the proceedings at the Feast, went to the house of the clerk of the tribe, and then and there informed the clerk of the disposition made of the decedent's lands, and the clerk thereupon recorded them upon the book

of record of the tribe in the names of the several distributees. The so-called administrators thereupon proceeded to lease one of the parcels to the defendant Luckman by a written lease, approved by the council and attorney of the reservation, for the purpose, as claimed, of raising money to pay the debts and funeral expenses of the decedent. William Hatch, the grantee of Thomas Skye, on November 16, 1907, took his deed of conveyance to the clerk of the reservation, and secured its record.

Subsequent to the death of Thomas Skye, his daughter, Phœbe Hatch, instituted proceedings in the Surrogate's Court of Erie county, seeking the appointment of administrators of the estate of the said Thomas Skye (deceased). The surrogate thereupon caused citations to issue and be served upon the said Carpenter, Parker, and James Skye, advising them of the filing of the petition for letters, and directing them to show cause why such letters should not be issued. They appeared in obedience to such mandate and filed objections to the issuing of such letters, and contended before the surrogate that the Surrogate's Court had no jurisdiction to act in the premises. After a careful consideration of the questions raised, the Surrogate's Court decided it had jurisdiction, and authority to take jurisdiction over the estate of the said Thomas Skye, deceased, and issued letters of administration thereon to the plaintiffs Phœbe Hatch and Edwin R. Ford. The defendant Willis Luckman, acting under the lease given him by the Indian administrators, entered upon the premises described in the lease, and planted crops thereon, which he subsequently harvested and took away. The plaintiffs in the first above entitled action thereupon brought said action, alleging an unlawful entry on the land and a conversion of the crops, and asked damages for his so doing.

Subsequent to the commencement of this action, proceedings were instituted before the Peacemakers' Court of the Tonawanda Tribe by the said Cornelius Carpenter, Simon Parker, and James Skye, in which the complaint set forth in substance the facts as above stated, and demanded judgment awarding possession of the several parcels to the plaintiffs in accordance with the distribution made by the Tenth Day Feast. We shall refer more particularly to these proceedings hereafter. Thereupon the relators, William Hatch and Phœbe Hatch, instituted proceedings in this court, praying for a writ of prohibition enjoining and restraining the defendants from further proceeding in that action in the Peacemakers' Court. This is the second of the proceedings above entitled, and is to be disposed of at this time in connection with the action for conversion of crops brought against Luckman.

The contention of the defendants in both of these actions or proceedings, in brief, is:

First. That the customs prevailing on the Tonawanda reservation are superior to the laws of the state; or, to state the proposition in other words, that the laws of the state do not extend or apply to the matters in controversy, but that the Indian customs prevail.

Second. That the Surrogate's Court of Erie county had no juris-

diction to grant letters of administration upon the estate of Thomas Skye, deceased, and its decree is, therefore, void.

Third. That by the Indian custom the deed given by Thomas Skye to William Hatch is void, and consequently the lease given back to Thomas Skye is equally void.

Fourth. That the distribution of the lands of Thomas Skye at the Tenth Day or Dead Feast is valid and legal.

Fifth. That the plaintiff Phœbe Hatch, by the laws and customs of the Indians, cannot be deemed a member of the Tonawanda Tribe, but is in law a Cattaraugus Seneca Indian, and therefore incapable of holding land on the Tonawanda reservation.

Sixth. That the Peacemakers' Court of the reservation has jurisdiction and authority to decide the questions brought before it, and the writ of prohibition should not be issued.

The disposition of the questions involved are of great importance to the state, as well as to the individual litigants. It involves the whole question of the relation of the state and of its laws to Indians residing on the reservation, and their duties and obligations to the state and its laws.

The Tonawandas are not a separate and distinct Indian nation. The Tonawandas constitute only a tribal division of what is known as the Seneca Nation of Indians. There are but about 500 Tonawandas all told. They are largely civilized. Many of their number are men of education and character. They live on a separate reservation, lying partly in the county of Erie and partly in the counties of Niagara and Genesee. The reservation upon which they reside was acquired by purchase. It is well-known history that shortly after the Revolution a dispute arose between the state of New York and the state of Massachusetts over the ownership of the territory constituting Western New York. New York claimed ownership by virtue of royal grants from the English crown to the Duke of York. Massachusetts claimed the same territory under grants to the Plymouth and Massachusetts colonies. By the convention held at the city of Hartford in 1786, the differences of the two states were settled and adjusted by New York ceding to Massachusetts her pre-emption rights to extinguish the Indian title to the land, and by Massachusetts in turn recognizing New York's political sovereignty over the territory.

Prior to the year 1838, the Tonawandas, being a part of the Senecas (the latter being one of the Six Nations of New York Indians), occupied and possessed, by virtue of their long-continued Indian title, the grant of land known as the Tonawanda Indian reservation, a portion of which is still known as the Tonawanda Indian reservation. In 1838 a treaty was concluded at Buffalo Creek by and between the United States and the several tribes of New York Indians (including the Tonawandas), in and by which the New York Indians released to Ogden and Fellows, among other lands, those on the Tonawanda reservation, consisting of about 12,800 acres. Indian Affairs, Laws and Treaties, vol. 2, p. 502 (Kappler). By a subsequent treaty between the United States and the Senecas, in 1842 (7 Stat. 586), the Cattaraugus and Allegany Indian reservations of the Senecas were excepted from the provisions of the treaty of 1838 (7 Stat. 550); but the release of

the lands lying in the Buffalo Creek and Tonawanda reservations was confirmed. Indian Affairs, Laws and Treaties, vol. 2, p. 537 (Kappler). In 1857 another treaty (11 Stat. 735, 12 Stat. 991) was entered into by and between the United States and the Tonawanda Indians, in and by which the Tonawandas bought back from Ogden and Fellows a portion of the Tonawanda reservation containing about 67,-000 acres; the treaty providing:

"The lands so taken by deed to the Secretary of the Interior, in fee, to be held in trust for said Tonawanda Band of Indians, and their exclusive use and occupation and enjoyment until the Legislature of New York shall pass an act designating some person or public officer of that state to take and hold said land upon a similar trust for said Indians, whereby they be granted by the Secretary of the Interior to such person or public officer."

Subsequent to this treaty, deeds conveying the present reservation to the Secretary of the Interior of the United States were made. Later an act of the Legislature of New York was passed designating the Comptroller of the State as the public officer to receive a conveyance of the reservation from the Secretary of the Interior, "in trust for said Tonawanda Band of Indians, who shall, by virtue thereof, have and hold the exclusive use, occupation and enjoyment of said lands." Chapter 439, p. 762, Laws 1860. On February 14, 1862, Caleb Smith, as Secretary of the Interior, deeded said reservation to Lucius Robinson, as Comptroller of the State of New York, and his successors in office, "in fee for the Tonawanda Band of Indians, and their exclusive use, occupation and enjoyment," by deed recorded in Genesee county clerk's office in Liber 146 of Deeds, at page 82. It thus appears that the old Indian title and right of possession of the Indians was extinguished, and the Tonawanda Indians hold title by virtue of the deeds of conveyance above set forth. The political sovereignty of the state of New York attached to every foot of the land embraced within the boundaries of the Tonawanda reservation.

The Indians of this state do not possess the rights of citizenship, and are regarded as wards of the state. Johnson v. Long Island R. R. Co., 162 N. Y. 468, 56 N. E. 992. By reason of being wards and lack of citizenship, certain disabilities necessarily follow. Nevertheless the sovereignty of the state attaches to and governs every foot of the soil comprised within the reservation. The law of this state is supreme, and the Tonawandas, we think, can claim no sovereignty of their own superior to that of the state. The state from time immemorial has assumed to control and direct their affairs, and legislate in reference to them, and its authority so to do has never been doubted or questioned. Where the Indians assert any peculiar rights or privileges, they must find authority for them in the legislation and laws of the state, and not by reason of their peculiar customs or tribal existence from immemorial times. Such sovereignty as they formerly possessed, we think it may be safely asserted, has at this time been merged and lost in the greater sovereignty of the state under which they live, and to which they must look for protection of life and property.

In the early part of the last century an Indian woman was tried and convicted on charges of sorcery and witchcraft by an Indian

court or council in what is now a part of the city of Buffalo. She was condemned to be executed. Two young Indians were directed to carry out the sentence of death. She was bound to the stake for that purpose; but, the courage of her executioners failing, an Indian by the name of Soo-non-gize, sometimes called "Tommy Jemmy," seized a tomahawk and sank it into her skull. He was arrested, tried, and convicted of murdering the woman, and his case carried for review to the Court for the Correction of Errors. It was contended before the courts that the killing of the woman was but the carrying out of the directions of the judgment of an Indian court, valid in law, for which the executioner should not be legally prosecuted. The court of necessity repudiated the contention and held the law of the state supreme.

As an outcome of this case of "Tommy Jemmy," the Legislature, by chapter 204, p. 202, of the Laws of 1822, passed an act declaring that the sole and exclusive jurisdiction of trying and punishing all and every person, of whatsoever nation or tribe, for crimes and offenses committed within any part of the state, except crimes against the United States and in violation of its laws, was exclusively vested in the courts of justice of this state. The same act pardoned the Indian "Tommy Jemmy." We do not understand that the act in question created any new power, or undertook to withdraw from the Indians any power or authority previously enjoyed by them, but was rather declaratory of the power the state actually already possessed. We are fortified in this view by the preamble of the act in question, which proceeds to recite that:

"Whereas, the Senecas, and other tribes of Indians residing in this state, have assumed the power and authority of trying and punishing * * * for supposed crimes by them done and committed in their respective reservations, and within the state; and whereas the sole and exclusive cognizance of all crimes committed within this state belongs of right to courts holden under the Constitution and laws thereof, as a necessary attribute of sovereignty, * * * therefore," etc.

The same reasons for asserting exclusive jurisdiction in criminal matters obtain in civil matters. Since that time the Indians of this state have advanced in intelligence, education, and civilization, and we can see no reason why the common law of the land should not apply to and govern them and their affairs, save as special exemptions and privileges have been conferred upon them, or flow from their relation of wardship to the state. When, therefore, the Tonawandas, or any member of their tribe, assert special rights and privileges or exemptions from the common law of the state, the claim should be subjected to the strictest scrutiny.

In this case peculiar rights are asserted by reason of the alleged existence of what is known as the Tenth Day or Dead Feast, and certain distribution and division of the property of the late Thomas Skye made at it. It appears there did exist among the Indians, coming down from immemorial times, a peculiar custom known as the Tenth Day or Indian Dead Feast. It was a custom wherein the relatives of the deceased, and members of his tribal clan, or such as chose to attend, assembled at the last place of residence of the dead man on the tenth

day after his death and united in a feast. It had somewhat of a religious character, for it was thought by many that the spirit of the dead man joined the company in the feast prior to his final departure to the Happy Hunting Ground. On this occasion it was customary for those present to agree upon a division and distribution of such property as the deceased left. There was such a meeting after the death of Thomas Skye, and an attempted distribution of his lands and property was made.

It is contended that this feast constituted an Indian probate court, and that this court and every one else are bound to respect the action thus taken. We think it a sufficient answer to that contention that such a court has no sanction for its existence in the Constitution or in any legislation of this state. It has never been recognized in law as having any legal existence. It has no existence in law. The fact that Indians' estates may have been divided and distributed in this manner is no argument for the claims here made. So have the heirs and next of kin of white men made division of estates without the instrumentality of probate courts. But such cases do not establish a court, or make actions of such assemblies legally binding. We, therefore, are constrained to hold that the Tenth Day Feast and the actions of those attempting to administer and divide the lands and property of the late Thomas Skye was wholly without warrant of law and void.

In this connection we might say that the custom of the Tenth Day Feast, in so far as it was possible, was formally abolished by a resolution of the council of the tribe passed about the year 1888. Such is the testimony in this case, and it stands undisputed. But we deem it unimportant, in the disposition of this case, whether the custom was in fact abolished or not, for no court can be recognized as having any authority or standing to deal with Indian affairs, except such as may have been created and exist by virtue of the Constitution of this state, or by legislative action. The only court on the Tonawanda reservation created and existing by authority of law is the "Peacemakers' Court." The powers and authority of the Peacemakers' Court are defined by section 47 of the Indian Law (Laws 1892, p. 1585, c. 679).

This brings us to the consideration of the action of the Surrogate's Court of Erie county, which granted letters of administration to the plaintiffs Phœbe Hatch and Edwin R. Ford on the estate of Thomas Skye, deceased. The defendants contended the Surrogate's Court had no authority to act in the premises, that it had no jurisdiction to grant letters or make any decree, and that, therefore, its decree is absolutely void, and vested the administrators with no rights or authority over the property of the intestate. This the defendants contend is true, notwithstanding that the parties to this proceeding were cited and appeared in the Surrogate's Court, and that no appeal was taken from the decree of that court, and it stands unreversed.

The defendants rely on the case of Dole v. Irish, 2 Barb. 639, to support their contention. Whatever force and effect the case of Dole v. Irish had, we think, has been greatly impaired and weakened by the more recent case entitled Matter of Printup's Estate, 121 App. Div. 322, 106 N. Y. Supp. 74. In that case, Daniel Printup, an Indian, died intestate on the Tuscarora reservation, in the county of Ni-

agara. A petition was presented to the Surrogate's Court of Niagara county for letters of administration on his estate. The petition, among other things, stated that the Tuscarora Indians had no Peacemakers' Court or Surrogate's Court, and these allegations were not denied. The surrogate, however, refused to assume jurisdiction and dismissed the petition. On appeal to the Appellate Division, the order dismissing the application was reversed, and the court held that, as the Tuscarora Indians residing on that reservation had no Peacemakers' Court, or other judicial tribunal, in which the estate of the deceased Indian could be administered, the surrogate had jurisdiction to grant letters of administration. The court also held that section 5 of the Indian law of the state (Laws 1892, p. 1575, c. 679), applying to all Indians, and providing that any demand or right of action, jurisdiction of which is not conferred upon a Peacemakers' Court, may be prosecuted and enforced in any court of the state, the same as if all the parties thereto were citizens, applied to the situation presented, and authorized the Surrogate's Court to take jurisdiction of the matter.

We think the Printup Case is decisive of the right of the surrogate of Erie county to grant letters of administration on the estate of Thomas Skye. It is true the Tonawanda Indians have a Peacemakers' Court, created by the statutes of this state. The jurisdiction conferred by that statute upon the Peacemakers' Court is exceedingly limited, and gives that court no right to exercise any of the power and authority conferred upon Surrogates' Courts in reference to decedent's estates. The Tenth Day Feast, we hold, has been abolished by the action of the Indian council of the tribe, if it ever had any existence, and had no right to exercise powers of division and distribution over such estates. The surrogate of Erie county, in granting letters of administration on the estate of Thomas Skye, held, as matter of fact, that there was no court in existence on the Tonawanda reservation having authority to administer on the estates of deceased Indians.

The question was also before the same court in the case of Peters v. Tallchief, 121 App. Div. 309, 106 N. Y. Supp. 64. The proceedings were brought to recover the possession of certain lands on the Tuscarora reservation, occupied by Jeremiah Peters, a Tuscarora Indian, for many years and up to the time of his death. Both the petitioner and the defendant were Tuscarora Indians; the defendant being the daughter and the petitioner the daughter-in-law of the deceased. The land had been held by the deceased under an Indian allotment. The petitioner claimed the land by virtue of a devise made by said Jeremiah Peters, and had occupied and claimed to own the premises, but had been ousted by the defendant, whereupon summary proceedings were brought before a justice of the peace, who awarded the possession to the petitioner. On appeal to the Niagara County Court, the order of the justice was reversed; but on appeal to the Appellate Division of this court the judgment of the County Court was reversed. It was held that by virtue of section 5 of the Indian law the justice of the peace had jurisdiction to entertain the summary proceedings, although the controversy was between two members of the Tuscarora Band and related to lands on the reservation. The court held the Indian right of possession a substantial right, entitling him to

the exclusive possession, and sanctioned by Indian Law (Laws 1892, pp. 1575–1596, c. 679) §§ 7–90, which authorized a native Indian to take, hold, and convey real property, the same as a citizen (section 2), and that the right of an Indian under such an allotment of tribal lands had been recognized and protected by our state courts. Jimeson v. Pierce, 78 App. Div. 9, 79 N. Y. Supp. 3. It was held the right of the petitioner to the lands was not only valid, but that she had the right to resort to our courts to redress a wrongful intrusion thereon by the defendant, under the authority given by section 5 of the Indian law.

To hold that an Indian is to be denied full and free access to our courts for the protection of his rights and the redress of his wrongs would be a monstrous denial of justice, particularly where the state has provided no special tribunal of their own for the settlement of such matters. The serious consequences which migh follow such an attitude of our courts is well illustrated in the very case now under consideration, where it seems to us a great wrong is attempted to be done the daughter of Thomas Skye by those having no natural or legitimate claims to his estate. We are therefore constrained to hold that the decree of the Surrogate's Court granting letters of administration to the plaintiffs Hatch and Ford on the personal property left by Thomas Skye was properly granted, and vested in them the right to administer the estate left by the decedent. If the lease given by William Hatch to Thomas Skye of the lands in question for five years is a valid lease, then that leasehold is to be deemed personal property, and passed to the plaintiffs in their representative capacity, and their right to bring this action against Luckman for a conversion of the crops growing on the land is complete.

The validity of the lease to Skye depends upon the validity of the deed given by Skye to William Hatch. If Hatch's title fails for any invalidity of the conveyance to him by Skye, the lease given back to Skye by Hatch must also fail. The deed to Hatch possesses all the formalities sufficient to convey a good and sufficient title. It is, however, contended by the defendants that the deed in question is invalid and insufficient to pass to Hatch the Indian title of Skye; that by the custom and usage prevailing on the Tonawanda Indian reservation, transfers of title to land on the reservation are not made by written conveyance, but, where transfers have been made from one Indian to another Indian, it has been the custom for the parties to appear before the clerk of the reservation and have the transfer noted and recorded in the record book kept for that purpose, without the instrumentality of a written conveyance.

Unquestionably this method of making of conveyances has been used to a greater or less degree by the Tonawanda Indians. But it has not been a uniform custom. The evidence in this case discloses that other methods of transferring lands prevailed. Written deeds, duly signed and acknowledged, have been passed and recorded, and recognized as proper means of conveying Indian lands. The evidence to establish a custom, so as to make it binding, is, in my opinion, insufficient in this case. The fact that in a majority of cases a transfer has been made by one method does not preclude the validity of making a transfer in another, particularly where the transaction is evidenced by

writing. The evidence falls far short of establishing any such uniform custom as is contended for. In order to establish and give validity to a custom, it must be certain, reasonable, continuing from time immemorial, continuing without interruption, not opposed to law, or calculated to violate law. 6 Wait's Actions and Defenses, p. 622. A custom may not be proved to contravene a rule of law. Hopper v. Sage, 112 N. Y. 530, 20 N. E. 350, 8 Am. St. Rep. 771; Wright v. Boller, 42 Hun, 77. The evidence fails to establish a custom as thus defined.

The provisions of the Indian law meet fully the situation presented in this case, and sustain the validity of the deed given by Skye to William Hatch. Allotments of lands on the Indian reservation are sanctioned by Indian Law (Laws 1892, c. 679) §§ 9–90. The same law expressly authorizes a native Indian "to take, hold and convey real property the same as a citizen." Section 2. This right of an Indian under such an allotment of tribal lands has been recognized and protected by the courts. Jimeson v. Pierce, 78 App. Div. 9, 79 N. Y. Supp. 3; Peters v. Tallchief, 121 App. Div. 311, 106 N. Y. Supp. 64; Jemison v. Bell Tel. Co., 186 N. Y. 493, 79 N. E. 728, affirming 109 App. Div. 911, 95 N. Y. Supp. 1153. The statute in question relates not only to the capacity to hold and convey, but as well to the method of conveyance.

We find, therefore, that the deed to Hatch was valid, and conveyed to him all the right owned by Skye in the lands described, and consequently the leasehold interest given by Hatch to Skye is equally valid. The right of the administrators to recover in the action against Luckman we therefore deem complete, and all that remains for our consideration in the case is the amount of damages to be awarded.

It is contended that the measure of damages is not the value of the crops removed, but the rental value of the land on which they were grown. This appears to be the rule where the action is one for ejectment, with an accounting for the use and occupation during the time the premises were unlawfully withheld. Woodhull v. Rosenthal, 61 N. Y. 394; Wallace v. Berdell, 101 N. Y. 13, 3 N. E. 769. We do not think this rule applies where the action is for the value of the crops removed, as in this action. The crops removed were, by stipulation, worth $30.80, for which sum judgment against Luckman is directed.

This brings us to the consideration of the proceeding for a writ of prohibition seeking to restrain the defendants in that action from prosecuting before the Peacemakers' Court of the reservation an action brought by the said Cornelius Carpenter, Simon Parker, and James Skye. The complainants in that action begun in the Peacemakers' Court set up and allege the death of Thomas Skye; his ownership of the parcels of land in question at the time of his death; that Thomas Skye left no descendants or children eligible to inherit real estate on the reservation, except James Skye; that Phœbe Hatch, his daughter, was and is a Cattaraugus Indian according to the customs of the Indians; that Cornelius Carpenter and Simon Parker are his nephews, and as such administrators of his estate. The complaint sets up the proceedings at the so-called Tenth Day Feast; that said Cornelius Carpenter and Simon Parker, as administrators of Thomas Skye, con-

veyed to James Skye a parcel designated in the complaint. It alleges the invalidity of the deed given by Skye to William Hatch. It alleges that William Hatch and Phœbe Hatch had wrongfully entered on said premises and removed a quantity of hay. It alleges that Cornelius Carpenter, Simon Parker, and James Skye are the owners of all the real estate owned by Thomas Skye, and entitled to the peaceful possession thereof; and concludes by the following prayer for relief, to wit:

"Wherefore these plaintiffs ask that judgment be granted awarding these plaintiffs the full and peaceful possession of all the lands thus held by the said Thomas Skye, including the dwelling house and the haystack standing within the bounds of the lot designated as 'Schedule A,' and that the defendants and all other persons not lawfully thereon be restrained by the order of this court from interfering with or interrupting these plaintiffs in the peaceable possession and occupation of the premises, with costs of this action against the defendants."

The writ of prohibition is asked, not only against the plaintiffs, but against the peacemakers from proceeding in the action.

We think the relators are entitled to the writ. If the Peacemakers' Court has not been given authority to deal with the questions in dispute, it becomes the plain duty of this court to intervene and by its mandate arrest further proceedings. The Peacemakers' Courts on the Allegany, Cattaraugus, and Tonawanda reservations exist by virtue of section 47 of the Indian law. It provides that:

"The Peacemakers' Court of each reservation shall have authority to hear and determine all matters, disputes and controversies between Indians residing on such reservation, whether arising upon contracts or for wrongs, and particularly for any encroachments or trespass on any lands cultivated or occupied by any one of them, and which shall have been entered and described in the clerk's book of records."

But the act provides:

"The peacemakers shall in no case award more than one hundred dollars, exclusive of costs, in favor of any party, in any one complaint or suit."

The same section then proceeds to confer on the Peacemakers' Courts of the Allegany and Cattaraugus reservations certain powers not given to the Peacemakers' Court of the Tonawanda reservation. To these courts it gives the power to grant divorces between Indians, "and to hear and determine all questions and actions between individual Indians residing thereon involving the title to real estate on such reservations." This power has been purposely withheld from the Peacemakers' Court of the Tonawanda reservation; but, notwithstanding, the action instituted by and before the defendants in the prohibition action related exclusively to the disputed title to the lands once owned by Thomas Skye. The Peacemakers' Court of the Tonawanda reservation was given no such authority. Nor does it possess any equity powers. Its powers seem to be confined to cases where a money judgment not exceeding $100 in amount can be awarded.

That it was never the purpose and intention of the Legislature to confer jurisdiction upon the Peacemakers' Court of the Tonawanda reservation to pass upon any question where the title to Indian lands is involved is shown by reference to the provisions of section 8 of the

Indian law. This section, in substance, declares that no one but members of the nation, tribe, or band shall reside upon the reservation of each. It further provides that the county judge of the county in which such lands are situated, upon complaint to him, shall inquire and determine whether the person complained of has unlawfully intruded upon lands of the reservation, and issue his warrant to the sheriff to remove such intruder. Ample and full remedies are provided for such cases, without committing any such authority to the peacemakers, whose jurisdiction is confined to more trivial matters.

The Peacemakers' Court, in entertaining the suit brought in this court, have exceeded all authority, and the writ prayed for should issue.

In view of the fact that before his death Thomas Skye conveyed the lands owned by him to William Hatch, and we have upheld the validity of that deed, it has become, perhaps, unnecessary for us to add anything touching the rights Phœbe Hatch would have had in the lands as heir of her father, Thomas Skye, had such a conveyance never been made. Nevertheless, in view of the contentions of the defendants and the importance of the question as bearing upon the relations of the parties to the tribe and its members, we are constrained to briefly discuss the propositions raised.

We cannot accept the contention on the part of the defendants that in that event she would have acquired no rights in the lands in question. It is true, by the provisions of section 8 of the Indian law, it is provided that:

"Except as otherwise provided by law, no person shall settle or reside upon any lands owned or occupied by any nation, tribe or band of Indians, except the members of such nation, tribe or band."

It is also true that, according to ancient custom of the Indians, the clan and tribal relations of an Indian are supposed to follow that of the mother, rather than that of the father. This ancient custom comes down from barbaric days, when the marital relations were loose and uncertain, and it was often difficult to determine the paternity of a child. Since those times the Indians, and particularly the New York Indians, have progressed in education. They have adopted the ways and life of civilization. They have ceased to be nomadic. They live and maintain themselves by honorable labor in the cultivation of their farms. They have their schools and churches, and in their mode of life differ little from the civilized white man. By section 3 of the Indian law, the laws of the state relating to the capacity to contract marriage, the solemnization of marriage, the annulment of the marriage contract, and divorce are made applicable to Indians. The reasons for the recognition and enforcement of the old custom by which a child was deemed to take its clan and tribal relation from the mother, rather than the father, no longer exist, and we can see no good or sufficient reason why tribal relation in the case of the Indians on the Tonawanda reservation, as well as on the Cattaraugus and Allegany reservations, should not be determined by the rule of the common law, by which the lineage of the child follows that of the father.

We are of the opinion that the Legislature of the state, when it passed the law providing that none but members of the tribe or band

should have the right to reside upon the reservation lands, had the rule of the common law in mind, and not the old Indian custom, and that the statute must be interpreted by the rule of the common law. This view is confirmed by the statute of the state in reference to the allotment of Indian lands. By the statute of 1843 (Laws 1843, p. 310, c. 228) and of 1845 (Laws 1845, p. 146, c. 150) such lands were to be partitioned and allotted "for separate cultivation and improvement or occupation by an Indian and his family." By section 7 of the Indian law, these provisions are substantially re-enacted into the Indian law, providing that tribal lands may be divided and partitioned "among the individuals and families of such nation, tribe or band," and further declaring that:

"No lands occupied and improved by any Indian according to the laws, usages or customs of the nation, tribe or band, shall be set off to any person other than the occupant or his family."

The purpose of these enactments was to protect the reservation lands from intrusion and settlement by white men, and to preserve to the Indians the exclusive occupation of them, and to secure to them and "their families" exclusive enjoyment thereof. The Legislature was jealous to protect the interests of the family in the reservation lands— a very wise and just policy. To hold that Phœbe Hatch, the sole legitimate child of Thomas Skye, is incapable of taking lands left by her father, simply because her mother happened to be from the Cattaraugus reservation, would be to defeat the plain purpose and intent of the law of the state, and a travesty of justice.

It does not appear at just what time the wife of Thomas Skye died, but we are justified in believing that during all her married life she lived on the Tonawanda reservation with her husband, Thomas Skye, without protest. Phœbe Hatch was born on the reservation, and all her life has lived there, and is now the wife of William Hatch, a Tonawanda Indian. She has for years been a teacher in the schools on the reservation, and must be deemed a member of the Tonawanda Tribe or Band.

We are not without precedent and authority for this view of the case. The questions involved were before this court for consideration and adjudication in the case of Seneca Nation of Indians v. Chauncey C. Jimeson. Mr. Justice Daniels decided the case, and wrote an opinion filed in the Erie county clerk's office in August, 1888, and published in a book entitled "Indian Problems." The action was brought to recover certain lands on the Cattaraugus Indian reservation. It appeared that Chauncey C. Jimeson was a Seneca Indian, who had intermarried with Adelaide E. Jimeson, a white woman. He had children by her. Chauncey C. Jimeson died, and it was contended there, as in this case, that according to the custom the lineage of the children followed that of the mother, and the children should be considered white persons, and not Indians, and for that purpose incapable of taking lands either under a will or by descent. Justice Daniels, however, held to the contrary. He held that under the statute authorizing allotments of Indian lands (Laws 1843, p. 310, c. 228; Laws 1845, p. 146, c. 150), the children of Chauncey C. Jimeson had the right to inherit from their father. In his opinion he said:

"This statute has not defined or restricted the family to those persons who should be of unmixed Indian blood; but it has, in the most general manner, secured the enjoyment of property allotted and assigned in this manner to the family and legal representatives of the deceased Indian, and whether that family may be of the whole blood of the Indian or only of the half blood of the nation who is entitled to be protected in the use and enjoyment of the property under this provision of the statute. For in no other manner can full effect be given to the language of the statute through which the occupancy of the land has been secured to the Indian and his family; and in this family the law in no manner distinguished between Indians of the half blood and Indians of the whole blood. And it follows from these provisions that, as the defendant is the son of Chauncey C. Jimeson, who received and occupied this property under an appropriation undoubtedly made of it for the benefit of his ancestors, he is, as a member of his family, entitled to be protected in its possession, and for that reason judgment must be directed in his favor in this action."

The same question was again before this court in the case of Seneca Nation of Indians v. Lehly, which was affirmed on appeal by the General Term of this court. Seneca Nation of Indians v. Lehly, 55 Hun, 83, 8 N. Y. Supp. 245. In that case Justice Daniels used the following language:

"The offspring of Indians follow the condition of the father, and the decision is not affected by the concession that there is a custom among the Seneca Nation that the lineage of the child follows that of the mother, and is governed by it."

In other words, in face of the concession, custom must give way to law. In the General Term, Judge Macomber, speaking for the court, said:

"It matters not whether the family thus coming into possession of the lands was of the whole blood or not, the defendant Harriet Lehly, the daughter of Chauncey C. Jimeson, is a member of the family, and entitled to be protected in her possession."

Without hesitation we therefore hold that the plaintiffs are entitled to recover in the action against Luckman, and are also entitled to the writ of prohibition prayed for against the peacemakers of the reservation and the complainants in that proceeding. We have written thus at length in the confident belief that the rules of law above expressed will redound to the permanent good and advancement of the Indians, not only on the Tonawanda, but upon other, reservations.

Let findings be drawn in accordance with the views herein expressed. So ordered.